Freddie Joe Peterson, the appellant herein, was indicted for and convicted of the murder of Bobby Bush, whom he shot twice with a pistol. The appellant was sentenced to fifty years' imprisonment in the penitentiary.
On Thursday evening, August 21, 1980, the appellant and his girlfriend, Bonnie Fritz, went with Vicki Stephens to the Ramada Inn Lounge "for a drink." While they were there, Ms. Fritz met Bobby Bush, whom she invited to her table for a drink. Ms. Fritz, Ms. Stephens, Bush and the appellant were together for the remainder of the night until the lounge closed at 1:00 a.m. Fritz then drove Stephens and the appellant back to her apartment.
According to Fritz, after Stephens had left the automobile, just outside Fritz's apartment, she told the appellant that he could not "come in." The appellant pulled out a pistol from underneath the front seat of the car and pointed it at her head. Fritz and the appellant walked to Fritz's apartment where, once inside, she again asked him to leave. According to Fritz, Stephens also pleaded with the appellant to "go home" before she, Stephens, left. When Fritz again asked him to leave, the appellant got mad and knocked her down. As Fritz and the appellant struggled, appellant's gun discharged twice. The appellant was intoxicated and began cursing and threatening to kill not only Fritz, but also a number of other people just to demonstrate that he was a "mean" person. Shortly thereafter, Bush came to the apartment door looking for Ms. Stephens. While Bush was standing in the doorway, the appellant began cursing again and threatened Bush with the pistol. As Fritz ran toward her bedroom to get a shotgun, she saw the appellant walk toward the door, his pistol still pointed at Bush. She heard the appellant fire the fatal shots at Bush. Bush was unarmed at the time.
Fritz further testified that immediately after the shooting, while she was trying to load her shotgun, the appellant again pointed his pistol at her head and threatened to kill her. After she had called the police, as she was attending to the victim, the appellant looked at the victim and exclaimed, "Die you son-of-a-bitch, die."
Robert Couch, one of the ambulance attendants, testified that he heard the appellant say, "I should have killed the [S.O.B.] when I had a chance to."
Dr. Henry Santina testified that the victim was shot twice, once in the right chest and once in the back. The fatal shot was the one to the right chest which penetrated the lung and caused shock from extensive hemorrhaging. The wound in the back was in the left shoulder. The bullet that entered through the victim's back followed a downward path where it grazed the heart and finally lodged behind the breastbone.
The appellant did not deny that he shot and killed the victim. However, he claimed that he acted in self-defense.
The appellant explained that he lived with Ms. Fritz, and that the argument he had with her after they arrived home that night concerned her desire to "go out" again without him. He testified that he had brought his pistol "in from the car" and still had it in his right hand, as he struggled with Fritz to make her stay home. The pistol was discharged twice, accidentally, during the struggle. He denied ever threatening Fritz with his pistol. He explained that his argument with Fritz had ended and that he and Fritz had both "calmed down," when the victim came to the door. The victim appeared to be "very *Page 1374 
mad and upset." The appellant testified that he warned the victim not to enter the apartment and, then, threatened the victim with his pistol as the victim started toward him. He pleaded with the victim to leave. He shot the victim only after the victim had refused to leave and had "slowly lunged" toward the appellant. The appellant, explained that he feared for his life because he, the appellant, was a small man with certain physical disabilities and the victim was very large, well over 200 pounds, and muscular. The appellant denied threatening Fritz after the shooting and he denied making those statements, as the victim lay dying on the floor, that were attributed to him by Fritz and Couch.
The appellant argues that the state committed reversible error by soliciting, from different witnesses, testimony that impermissibly referenced a series of events which occurred in February, 1980, when the appellant was, allegedly, evicted from Ms. Fritz's apartment. The appellant contends that the February incidents were prior crimes or specific bad acts, evidence of which was patently inadmissible for any purpose. We disagree.
Ms. Fritz was the key witness for the prosecution. Although she did not witness the shooting itself, she did witness all of the events leading up to and surrounding the shooting. She explained that the appellant had become very angry with her because she had repeatedly asked him to leave her apartment. She described the argument that ensued, including appellant's threats to kill her, his threats to kill others, generally, in the Tuscaloosa area to demonstrate that he was a "mean son-of-a-bitch from West Virginia," and the fact that he had fired his pistol twice before the victim arrived. She explained that the appellant was still cursing when the victim arrived, that he continued cursing and directed several threats at the victim, and that he accused the victim of coming to see her. She further explained that after he shot the victim, he again threatened to kill her and then pleaded with the victim to die, and stated that the victim was not "the first son-of-a-bitch I ever killed."
In light of this testimony, including Ms. Fritz's statements that the appellant was not living with her at the time of the shooting and that she had repeatedly asked the appellant to leave her apartment before the victim arrived, appellant's attorney made concerted and understandable attempts to discredit Ms. Fritz as a witness. Appellant's theory was that Fritz was a jealous and possessive woman who was testifying against him "to get back at him" for "moving out on her" and for "seeing" other women. During cross-examination of Fritz, in his zeal to demonstrate her alleged bias against the appellant, appellant's attorney induced the following exchange:
 "Q O.K. Now, now Bonnie [Ms. Fritz], you said you loved Fred [the appellant] at one point, is that right or did you not say that?
 "A I said at one time back in '79 maybe early part of '80 I thought at one time that I did care for the man.
"Q Then you quit caring, is that correct?
"A Yes, sir, I did.
 "Q Did you quit caring because he moved out on you, tried to move away from your apartment?
"A I had him moved.
"Q You had him moved?
"A Yes, I did."
Despite appellant's arguments to the contrary, it was this reference to the February incidents that "opened the door" to further inquiry into those matters. The state's solicitation, on redirect examination of Fritz, of additional explanatory facts about those incidents was entirely proper. "On redirect examination the state may examine the witness as to any matter injected into the case on cross examination by defense counsel within the discretion of the trial court." Chatom v. State,360 So.2d 1068 (Ala.Cr.App.), cert. denied, 360 So.2d 1074 (Ala. 1978); see, Satterwhite v. State, 364 So.2d 345 (Ala.Cr.App. 1977), reversed on other grounds, 364 So.2d 359 (Ala. 1978);Barton v. State, 376 So.2d 756 (Ala.Cr.App.), cert. denied,376 So.2d 761 (Ala. *Page 1375 
1979). Chatom, Satterwhite, and Barton all involved, as does the instant case, evidence of a prior, unrelated crime.
The other references to the February incidents, references cited by the appellant as reversible error, came after the examination of Fritz had been completed. None of those subsequent references were made solely to prove appellant's criminal propensity. "It is well settled that prior offenses committed by the accused are inadmissible when offered solely for the purpose of showing the accused's criminal propensity."Jones v. State, 362 So.2d 1303 (Ala.Cr.App. 1978), and cases therein cited. Instead, these additional, and more detailed, inquiries into the February incidents were made to rebut statements and inferences made by the appellant while he was testifying either on direct or cross-examination. The appellant had testified that on the few occasions when he had "moved out" of Fritz's apartment, he did so on his own initiative because she was "hard to live with" at times and often "drank" too much. He stated that whenever he "moved out," Fritz would become very upset and would beg him to return. He implied that these instances when he would voluntarily "leave her" were part of the reason that Fritz was biased against him at trial.
In light of these statements discrediting Fritz's testimony, the state further inquired into the February incidents, not to show that they resulted in prior convictions, but rather to show that in February 1980, Fritz had, in fact, evicted the appellant from her apartment. Because appellant insisted that he always moved out of Fritz's apartment voluntarily, and was never forced to leave, the state was permitted to disclose the details of the eviction, including the fact that the police had to disarm the appellant of a knife before they could forcibly remove him from Fritz's apartment. Although the trial court, perhaps, permitted a more detailed inquiry into the February incidents than was necessary to rebut appellant's testimony, none of the trial court's rulings, nor the actions of the state, constituted reversible error in the contexts in which they occurred. Rebuttal evidence, even evidence of prior crimes, is generally admissible within the sound discretion of the trial court. Vincent v. State, 231 Ala. 657, 165 So. 844
(1936); Jones v. State, supra; Norris v. State, 429 So.2d 649
(Ala.Cr.App. 1982). There was no abuse of discretion in this cause. The appellant contended that he always "moved out" voluntarily, the state forced him to admit that he was evicted in February, and the appellant himself was allowed to explain in detail the events surrounding the February eviction. The issue of Fritz's alleged bias against the appellant was, thusly, properly presented to the jury.
The appellant further challenges the admissibility of evidence of threats communicated by the appellant to Fritz in November 1980, after the shooting incident, and the admissibility of Emil Robinson's testimony that he had heard the appellant threaten to kill someone. The evidence of the November 1980, threats was permissible rebuttal evidence offered after the issue as to why Fritz had moved out of her apartment in November had already been raised by appellant's counsel during cross-examination of Fritz. See, Chatom v.State, supra, and Norris v. State, supra. Appellant's counsel had asked Fritz, on cross-examination, if she had moved out of her apartment in November because she could not afford it without appellant's support. Likewise, the non-specific reference by Robinson to a threat by the appellant to kill someone was proper rebuttal of appellant's own testimony that he had never threatened to kill anyone. Norris v. State, supra.
The appellant also contends that the trial court erred by not excluding, as inadmissible hearsay, Ms. Fritz's testimony that Vicki Stephens had also asked the appellant to leave Fritz's apartment on the night of the shooting. This evidence was "admissible hearsay" because Stephens's alleged statement was made to the appellant, i.e., "in the presence and hearing" of the appellant. See, Garrett v. State, 76 Ala. 18, 21 (1884);Beachum v. State, *Page 1376 346 So.2d 531 (Ala.Cr.App. 1977). It was also merely cummulative as to what started the argument between Fritz and the appellant, the argument that preceded the shooting of the victim. Therefore, it was not reversible error. See, Love v. State,377 So.2d 8 (Ala.Cr.App. 1979); Wyatt v. State, 419 So.2d 277
(Ala.Cr.App. 1982).
Additional arguments concern allegedly erroneous statements of law by the trial court in its oral charge to the jury and alleged errors by the trial court in refusing a number of appellant's requested written charges.
The appellant cites as reversible error several statements made by the trial court during its oral charge. However, only those statements to which timely objections were raised at trial were properly preserved for our review. We have reviewed the trial court's oral charge in its entirety and have concluded that any isolated, erroneous statements were not harmful to the appellant in light of the entire charge. A.R.A.P. 45.
After the trial court completed its oral charge, it solicited objections from both parties. The appellant made five specific objections to certain oral statements by the trial court. In an effort to cure any errors and to satisfy the appellant, the trial court conducted several bench conferences with the attorneys and gave several curative instructions to the jury. After the trial court had reinstructed the jury on several points of law, the appellant indicated that he was satisfied with the trial court's instructions. We commend the trial judge for taking the time to discuss the objections to his oral charge and for resolving the problems at that stage of the proceedings. This is precisely the procedure recommended by the Alabama Supreme Court in Ex Parte Allen, 414 So.2d 993 (Ala. 1982), affirming, 414 So.2d 989 (Ala.Cr.App. 1981), and in A.R.Crim.P.Temp. 14, with respect to refused written charges. The result was that the jury was properly informed on the law applicable to the case, including the critical aspects of appellant's claim of self-defense and the jury's option to find the appellant guilty of the lesser offenses of manslaughter and criminally negligent homicide, charges which were included, though not specified, in the indictment. This option to find lesser offenses was included in the final oral instructions given by the trial court and, contrary to appellant's arguments on appeal, it was clearly explained at that time.
The appellant further cites as reversible error the trial court's refusal to give the jury eight specific written charges that he had requested. The trial court did, however, give nine of appellant's other requested charges. Any error committed by the trial court in refusing the eight requested written charges cited by the appellant was not properly preserved for our review on appeal. See, Ex parte Allen, supra. As noted by the court in Allen, the automatic exception rule for refused written charges was abandoned when the legislature adopted §12-16-13, Code of Alabama 1975. Therefore, we are "not required to notice any alleged error or defect . . . unless the alleged error or defect was brought to the attention of the trial court." Ex Parte Allen, 414 So.2d 993, 994, supra. This is the rule applicable to cases, such as the instant case, tried after the adoption of § 12-16-13. At trial below the appellant neither excepted to the trial court's refusal to give the eight charges argued for on appeal, nor showed any disapproval thereof. In fact, after the trial court had given nine of appellant's requested charges and had finished instructing the jury, the appellant, in response to the trial court's inquiry, indicated that he was satisfied that the jury had been properly instructed. Moreover, the applicable legal principles stated in the refused charges appear to have been sufficiently covered by the trial court's oral charge and the requested written charges that were given.
Appellant's other arguments raised on appeal need not be addressed herein because they are either unsupported in the record or are totally without merit.
The appellant received a fair trial below and his substantial rights were well protected. *Page 1377 
He was well represented by counsel both at trial and on this appeal. At trial the jury simply decided the issues against him. On appeal, although appellant's arguments were well presented, we have determined that there were no errors requiring a reversal of this cause. Appellant's conviction and sentence are, therefore, due to be affirmed.
AFFIRMED.
All the Judges concur.