932 So.2d 923 (2005)
John Russell CALHOUN
v.
STATE of Alabama.
CR-00-0002.
Court of Criminal Appeals of Alabama.
April 29, 2005.
Rehearing Denied June 17, 2005.
Certiorari Denied December 16, 2005.
*933 Jeffrey W. Salyer, Birmingham; and William J. Willingham, Talladega, for appellant.
William H. Pryor, Jr., and Troy King, attys. gen., and A. Vernon Barnett IV, Kristi L. Deason Hagood, and Andy Scott Poole, asst. attys. gen., for appellee.
Alabama Supreme Court 1041425.
McMILLAN, Presiding Judge.
The appellant, John Russell Calhoun, was convicted of four counts of capital murder for murdering Tracy Phillips during the course of a robbery, during the course of a burglary, during the course of a sodomy, and during the course of a rape. The jury recommended, by a vote of 10 to 2, that Calhoun be sentenced to death. *934 The circuit court accepted the jury's recommendation and sentenced Calhoun to death.
The State's evidence tended to show that on May 8, 1998, Calhoun entered L.P.'s[1] and Tracy Phillips's home in Talladega and shot and killed Tracy Phillips. L.P. testified that on the evening of May 8 her neighbor telephoned her to tell her that there was a man looking in the windows of her house. L.P. told her husband, Tracy, and Tracy went to check outside. When Tracy returned to the house Calhoun, who was wearing a stocking mask over his face, was following behind him with a gun. L.P. said that she knew that the man in the mask was Calhoun because he had been to their house that day and she had also seen him when she had been posting signs earlier that day for a yard sale she was having. L.P. said that she ran upstairs to one of the bedrooms to hide her daughter and her daughter's friend and locked the bedroom door behind her. Moments later, she said, Tracy yelled from behind the door that Calhoun had a gun to his head and that if she did not open the door Calhoun would kill him. She complied and Calhoun entered the bedroom. Tracy pleaded for their lives and offered him money and jewelry. Calhoun declined and told L.P. to take off her clothes, get on the bed, and spread her legs. L.P. complied. Calhoun pushed Tracy's head between his wife's legs, held the gun to the back of Tracy's head, and pulled the trigger. The coroner testified that Tracy died of a gunshot wound to the back of his head, which severed his brain stem.
After shooting Tracy, Calhoun dragged L.P. downstairs, where he raped, sodomized, and beat her. She said that at one point she struggled with Calhoun for the gun, he became enraged, and he pointed the gun at her and pulled the trigger, but the gun did not fire. Calhoun then raped her again and told her to get any money that she had upstairs. She refused to go back upstairs because her husband's body was there, but she told Calhoun that she had jewelry in a downstairs bathroom. L.P. gave him some jewelry, he threw some of it down, and he left. L.P. then telephoned emergency 911.
A person matching Calhoun's description was seen fleeing the murder scene. Neighbors also saw Calhoun's car near the murder scene. One neighbor telephoned emergency 911. Police issued a "BOLO" for Calhoun's vehicle. After police were unsuccessful in locating Calhoun's vehicle, Charles Hedrick, a sheriff in the Talladega County Sheriff's Department, went to the area where Calhoun's mother lived and found Calhoun's vehicle hidden in some bushes. The next morning police returned to the area and conducted an extensive search. Officer Wren Cooley of the Talladega Police Department spotted Calhoun in the area, pursued him on foot, but lost him. At one residence police obtained consent to search the homeowner's house and discovered Calhoun hiding under a bed.
Forensic tests showed that the blood found on Calhoun's discarded clothes was consistent with L.P.'s blood. DNA tests performed on semen collected from the victim was consistent with Calhoun's DNA. Also, during the struggle between L.P. and Calhoun the two bit one another. A bite-mark expert testified that there was an extremely high probability that the bite mark on L.P.'s neck matched Calhoun's *935 dental impression and that the bite mark on Calhoun's arm matched L.P.'s dental impression.
The jury convicted Calhoun of all four counts of capital murder  murder committed during a robbery, murder committed during a burglary, murder committed during a rape, and murder committed during a sodomy.
At the sentencing hearing Calhoun presented the testimony of Dr. Alvin Sheeley, a psychologist. Dr. Sheeley testified that Calhoun was close to meeting the clinical definition of having an impulse-control disorder. The State presented testimony that Calhoun had two prior convictions for attempted rape in the first degree and one prior conviction for sexual abuse in the first degree. The jury, by a vote of 10 to 2, recommended that Calhoun be sentenced to death.
The circuit court held a separate sentencing hearing pursuant to § 13A-5-47(c), Ala.Code 1975, and sentenced Calhoun to death. This appeal, which is automatic when a defendant has been sentenced to death, followed. See § 13A-5-53(a), Ala.Code 1975.

Standard of Review
Because Calhoun has been sentenced to death, this Court must search the record for any plain error. Rule 45A, Ala.R.App.P., states:
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
The Alabama Supreme Court in Ex parte Bryant, [Ms. 1990901, June 21, 2002] ___ So.2d ___ (Ala.2002), described the circumstances that will constitute plain error.
"`"`Plain error' arises only if the error is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings."' Ex parte Womack, 435 So.2d 766, 769 (Ala.1983) (quoting United States v. Chaney, 662 F.2d 1148, 1152 (5th Cir.1981)). See also Ex parte Woodall, 730 So.2d 652 (Ala.1998). `"In other words, the plain-error exception to the contemporaneous objection rule is to be `used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.'"' Ex parte Land, 678 So.2d 224, 232 (Ala. 1996) (quoting United States v. Young, 470 U.S. 1, 15 (1985) (quoting in turn United States v. Frady, 456 U.S. 152, 163 n. 14 (1982))). `To rise to the level of plain error, the claimed error must not only seriously affect a defendant's "substantial rights," but it must also have an unfair prejudicial impact on the jury's deliberations.' Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998), aff'd, 778 So.2d 237 (Ala.2000), cert. denied, 532 U.S. 907, 121 S.Ct. 1233 (2001). This Court may take appropriate action when the error `has or probably has adversely affected the substantial rights of the appellant.' Rule 45A, Ala.R.App.P. `[A] failure to object at trial, while not precluding our review, will weigh against any claim of prejudice.' Ex parte Woodall, 730 So.2d at 657 (citing Kuenzel v. State, 577 So.2d 474 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.1991))."
___ So.2d at ___ (emphasis added).

Guilt-Phase Issues

I.
Calhoun argues that the indictment charging him with murder committed during *936 the course of a robbery, Count II of the indictment, was not sufficiently specific to give him notice of the charged offense.
Initially, we note that Calhoun made no objections to the indictment. According to Rule 15.2(a), Ala.R.Crim.P.: "Objections based on defects in the commencement of the proceeding or in the charge, other than lack of subject matter jurisdiction or failure to charge an offense, may be raised only by pretrial motion as provided in Rule 15.3." Rule 15.2(c), Ala.R.Crim.P., also provides that if no objection is made at the appropriate time the issue is waived. Because there was no objection we are limited to determining whether Calhoun's substantial rights were prejudiced. See Rule 45A, Ala.R.App.P.
Count II charged:
"The Grand Jury of said County charge that before the finding of this Indictment and on or about the 8th day of May, 1998, in the County of Talladega, Alabama, John Russell Calhoun, whose true name is to the Grand Jury unknown otherwise than stated, did intentionally cause the death of, to-wit: Tracy Phillips by shooting him with, to-wit: a pistol, and John Russell Calhoun caused said death during the time that John Russell Calhoun was in the course of committing a theft of, to-wit: jewelry or lawful United States currency, a better description of which is to the Grand Jury unknown otherwise than stated, the property of, to wit: Tracy Phillips or L.P., by the use of force against the person of Tracy Phillips or L.P., with intent to overcome his physical resistance or physical power of resistance or with intent to compel acquiescence to the taking of or escaping with said property, and at the time caused serious physical injury to the said Tracy Phillips, in violation of § 13A-5-40(a)(2), of the Code of Alabama."
(Emphasis added.) Calhoun specifically argues that the State's use of the disjunctive "or" denied him due process because, he says, by using the disjunctive the State failed to notify him of the offense for which he was charged. Calhoun cites the cases of Harrison v. State, 384 So.2d 641 (Ala.Crim.App.1980), and Andrews v. State, 344 So.2d 533 (Ala.Crim.App.), cert. denied, 344 So.2d 538 (Ala.1977), in support of this contention.
In Harrison, the defendant was charged with violating the Child Abuse Act. The indictment did not state the means by which the child was abused and Harrison did not make a timely objection. This Court stated, "The omission of [the means used to accomplish the abuse] would render an indictment merely voidable rather than void. Consequently, such a deficiency must be timely and specifically raised by demurrer." 384 So.2d at 643 (emphasis added). Because Harrison failed to object, we held that Harrison had no remedy on appeal.
In Andrews, the defendant was charged with assault. The indictment did not name the victim. We reversed Andrews's assault conviction and stated:
"We find here an indictment which failed to inform the accused of a matter essential to the construction of a meaningful defense, which is a deprivation of his right to demand the nature and cause of the accusation against him as guaranteed in Article I, § 6, Constitution of Alabama 1901."
344 So.2d at 537.
The cases Calhoun cites have no application to the indictment issued in this case. Rule 13.2(a), Ala.R.Crim.P., addresses the nature and content of an indictment:
"The indictment or information shall be a plain, concise statement of the charge in ordinary language sufficiently definite *937 to inform a defendant of common understanding of the offense charged and with that degree of certainty which will enable the court, upon conviction, to pronounce the proper judgment."
This Court in Minshew v. State, 542 So.2d 307 (Ala.Crim.App.1988), rev'd on other grounds, Ex parte Gentry, 689 So.2d 916 (Ala.1996), stated the following concerning disjunctive pleading in an indictment:
"At common law, disjunctive pleading was bad and rendered the indictment defective. See, generally, Horton v. State, 53 Ala. 488, 489-90 (1875). The theory was that disjunctive allegations, those joined by the word `or,' made the averment uncertain as to which of two or more things was meant, and was thus violative of the constitutional provision which entitles the accused to be informed of the nature and cause of the accusation against him. Id. Therefore, at common law, if the State expected that its proof might constitute more than one offense or if it was uncertain about which means of committing the same offense its evidence might establish, then the proper way to meet these possible variations in the proof was to charge each possibility in a separate count of the indictment. Id.

"The requirement of a separate count conforming to each possibility the proof might raise was changed  in three instances at least  by statute in Alabama as early as 1852....
". . . .
"Although the use of either the disjunctive or the conjunctive averment alone is appropriate, the use of both together has been condemned as a `grammatical monstrosity.' Boggs v. Commonwealth, 285 Ky. 558, 561, 148 S.W.2d 703, 704 (1941). `While there has been widespread contempt for the use of the disjunctive phrase "and/or" in statutes, regulations, and pleadings, "the better rule is that the use of the disjunctive is fatal only where uncertainty results."' State v. Getty Oil Co., 305 A.2d 327, 332 (Del.Super.1973). See also Davis v. State, 476 N.E.2d 127, 132 (Ind.App.1985) (`the charge of endangerment "and/or" abandonment ... effectively charged [the defendant] with both acts; the use of "or" was superfluous'); Plunkett v. State, 719 P.2d 834, 841 (Okla.Cr.App.1986), cert. denied, Plunkett v. Oklahoma, 479 U.S. 1019, 107 S.Ct. 675, 93 L.Ed.2d 725 (1986) (no error in use of `and/or' in light of statute which provided that `where the offense may be committed by the use of different means, the means may be alleged in the alternative in the same count'); State v. Pratt, 255 La. 919, 233 So.2d 883 (1970) (`and/or' averment did not hamper defendant's ability to understand the nature of the charge or to prepare a defense.) See also Harris v. City of Vestavia Hills, 49 Ala.App. 171, 173, 269 So.2d 626 (1972)."
542 So.2d at 312-13.
Although the use of disjunctive pleading is now discouraged, see Rule 13.3, Ala.R.Crim.P., its use will not render an indictment void. See Rule 13.5(c)(2), Ala.R.Crim.P. See also Minshew, supra, and Orr v. State, 107 Ala. 35, 18 So. 142, 143 (1895.)
Here, Count II of the indictment tracked the language of the capital-murder statute contained in § 13A-5-40(a)(2), and put Calhoun on notice of the charged offense. Calhoun suffered no prejudice by the State's use of the disjunctive in Count II of the indictment.

II.
Calhoun next argues that the State violated Brady v. Maryland, 373 U.S. 83, *938 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to disclose exculpatory evidence. Calhoun argues that there was evidence indicating that the police had been investigating another suspect in Tracy Phillips's murder and the State failed to disclose this information.
During cross-examination of Leon Thomas, an investigator for the Talladega County Sheriff's Department, Calhoun asked Thomas if the police had investigated any other suspect in regard to the homicide. Thomas answered no. After this witness was excused the circuit court held a hearing outside the jury's presence concerning "other suspect" evidence. Several police officers were questioned. Officer Ronnie Jones stated that he asked Nancy Rue, who had been working at the Phillipses' house around the time of the murder, if she had ever heard Tracy Phillips and a black male talking about an "eight ball" of crack cocaine. Jones testified that he asked that question out of the blue and that he had never been investigating any suspect but Calhoun. Also, Nancy Rue denied having heard any such conversation. There was never any evidence indicating that another suspect was investigated in this case. Moreover, the record clearly shows that Calhoun was arrested within a very short time after the murder. L.P. identified him as the killer to police. There is absolutely no indication in the record that there was any other suspect. The record fails to show that the State suppressed any information much less any exculpatory information. There was no Brady violation in this case.
Calhoun also argues that the circuit court limited his right to cross-examine Officer Thomas about other suspect evidence. However, the record does not support this contention. Clearly when Officer Thomas was asked he answered twice that police had not been investigating any suspect other than Calhoun. There is no error here.

III.
Calhoun argues that several pretrial rulings made by the circuit court were erroneous. He cites several different grounds in support of this contention.

A.
Calhoun first argues that the circuit court erred in failing to suppress physical evidence that was seized as a result of an allegedly illegal search of his property. Specifically, he argues that the T-shirt and shorts that linked him to the murder should have been suppressed because, he says, those items were seized from his house without a search warrant. Calhoun did not challenge the introduction of this evidence when it was introduced at trial. Therefore, there is little information in the record concerning the circumstances surrounding the seizure of these items. We review this issue for plain error. Rule 45A, Ala.R.App.P.
The record shows that at a pretrial status hearing the assistant district attorney listed discovery items the district attorney's office was releasing to Calhoun's attorney. One item, a "Permission to Search Form" for 133 Rubenville Lane  the address of Calhoun's mother's mobile home  is referenced at this hearing. (R. 35.) It appears that police had permission to search the mobile home where Patricia Garrett, Calhoun's mother, lived.
Nonetheless, Patricia Garrett testified that she stated that the items that were recovered by the police officers were found near a trash can outside her yard that she used to burn her trash. She further testified that Calhoun gave her the clothing items and she disposed of them. "The Fourth Amendment protects only reasonable expectations of privacy." Ex parte *939 Hilley, 484 So.2d 485, 489 (Ala.1985). Certainly, Calhoun had no reasonable expectation of privacy in items he had given to his mother and that she had attempted to dispose of. Based on the sparse record in this case we decline to find any plain error. Rule 45A, Ala.R.App.P.

B.
Calhoun, who is black, argues that the method of jury selection used in Talladega County discriminates against blacks. In his brief to this Court he cites an Internet Web site that contains the information that the 1994 census for Talladega County reflected that the black population of Talladega County was 31%. He argues that the trial court had an obligation to "examine the jury selection process to determine if there existed a prima facie case for race discrimination in the Talladega County jury pool selection process." (Calhoun's brief at page 128.)
Calhoun never challenged the method of selecting jurors used in Talladega County; therefore, the record contains no information about procedures used in Talladega County for selecting prospective jurors. Neither is there any information in the record concerning the racial makeup of the population of Talladega County. The only information on that subject is contained in Calhoun's brief. As we stated in Riddle v. State, 669 So.2d 1014, 1016-17 (Ala.Crim.App.1994):
"[E]xhibits attached to a brief are not evidence and cannot be considered by this Court on appeal. Huff v. State, 596 So.2d 16, 19 (Ala.Cr.App.1991). `"This Court is bound by the record [on appeal] and may not consider asserted facts which cannot be ascertained [from] th[at] record."' Bush v. State, 616 So.2d 394, 395 (Ala.Cr.App.1993) (quoting Richie v. State, 481 So.2d 454, 455 (Ala.Cr.App.1985))."
Calhoun had the burden of establishing a prima facie showing of racial discrimination. As the United States Supreme Court stated in Duren v. Missouri, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979):
"In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a `distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process."
439 U.S. at 369, 99 S.Ct. 664. Here, Calhoun failed to make even a minimal showing to satisfy the Duren test. There is no plain error here.

C.
Calhoun argues that the circuit court reversibly erred when it failed to exclude an investigator and L.P. from the courtroom during the entire trial.
Calhoun did not object to this issue; therefore, we are limited to a plain-error analysis. See Rule 45A, Ala.R.App.P.
The following occurred:
"The Court: Okay. As soon as the roll is called back there we will bring them out and get started with opening statements. Are there any things we need to take up before we get started with opening statements other than my preliminary instructions.
"[Defense counsel]: We would ask that the Rule be invoked.
"The Court: Do you have any witnesses in the courtroom other than the victim?

*940 "[Prosecutor]: We would ask that Eugene Jacks be excluded from the Rule and our victim. She is not in here right now.
"The Court: They can be excluded.
"[Prosecutor]: He is the investigator on this case.
"The Court: Are there any other witnesses in the courtroom for the State or the Defendant?
"[Prosecutor]: No, sir."
(R. 546.)
It is clear that Calhoun never objected when the State moved that the two witnesses be excluded pursuant to the Rule.[2] Moreover, Rule 615, Ala.R.Evid., addresses the Rule and its recognized exceptions. Rule 615, Ala.R.Evid., states:
"At the request of a party the court may order witnesses excluded so that they cannot hear the testimony of other witnesses and it may make the order of its own motion. This rule does not authorize exclusion of (1) a party who is a natural person, (2) an officer or employee of a party which is not a natural person designated as its representative by its attorney, (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause, or (4) a victim of a criminal offense or the representative of a victim who is unable to attend, when the representative has been selected by the victim, the victim's guardian, or the victim's family."
This Rule specifically grants a circuit court the authority to exclude a victim and a law-enforcement officer under the Rule. See Advisory Committee's Notes to this Rule. There was no error, much less plain error, here.

D.
Calhoun argues that the circuit court erred when it allowed the jurors to separate each evening. He asserts that by allowing the jurors to separate the circuit court violated his constitutional rights.
Rule 19.3, Ala.R.Crim.P., specifically allows the circuit court to permit the jurors to separate each evening without the consent of the parties. Rule 19.3(a)(1), Ala.R.Crim.P., states:
"In the prosecution of any felony case, the trial court, in its discretion may permit the jury hearing the case to separate during the pendency of the trial. Such a separation of the jury shall create a prima facie presumption that the accused was not prejudiced by reason of the separation."
Here, the circuit court gave detailed instructions before the jury separated each evening. The circuit court complied with the provisions of Rule 19.3(b), Ala.R.Crim.P. This Rule states that before the separation the trial court shall admonish the jurors that they are not
"(1) To discuss among themselves any subject connected with the trial until the case is submitted to them for deliberation;
"(2) To converse with anyone else on any subject connected with the trial, until they are discharged as jurors in the case;
"(3) To knowingly expose themselves to outside comments or to news accounts of the proceedings, until they are discharged as jurors in the case; or
"(4) To form or express any opinion on the case until it is submitted to them for deliberation."
*941 The circuit court complied with Rule 19.3, Ala.R.Crim.P. There was no error, much less plain error, here.

E.
Calhoun argues that the circuit court erred in failing to ensure that the proceedings were fully transcribed by the court reporter. Specifically, Calhoun argues that the circuit court erred in holding a bench conference outside the presence of the court reporter after the circuit court had completed its jury instructions in the guilt phase.
The following occurred at a hearing on a pretrial motion:
"The Court: Motion to require the presence of a court reporter at any and all hearings, sidebars, discussions in chambers with the Court or at any discussions with the Court whatsoever concerning this case. That is routinely granted and done in capital cases and most all cases. If for some reason something should arise, and the court reporter is not present, then all you need to do is just remind me, and it will be done. Routinely she is in my presence at any sort of hearing or conversation that might take place. Bring it to my attention if in fact the Court should drop the ball in that regard."
(Supplemental record at p. 6; emphasis added.) The record shows that this matter was never again brought to the circuit court's attention.
The record shows that after the circuit court gave its jury instructions in the guilt phase the prosecutor asked if he could approach the bench. Some type of discussion took place, and the circuit court then instructed the jury about the effect on a witness's credibility of a conviction for a crime involving moral turpitude. After this instruction both the prosecution and the defense counsel announced that they were satisfied. (R. 1583.) Calhoun never objected to what transpired off the record. Neither did Calhoun attempt to have the record supplemented, with this specific bench conference. Calhoun did move to have the record supplemented but no reference to this specific bench conference was mentioned in his motion to supplement.
As we stated in Wynn v. State, 804 So.2d 1122, 1143-44 (Ala.Crim.App.), cert. denied, 804 So.2d 1152 (Ala.2001):
"[I]t should have been apparent to the defense during the trial that the court reporter was not recording certain sidebars.... Defense counsel could have easily reminded the trial court that it had granted his motion for full recordation of the proceedings and remedied the omissions at that time. Therefore, this error was invited by the appellant."
Moreover, in determining whether there is reversible error based on an omission in the transcript we use the standard discussed in Ingram v. State, 779 So.2d 1225 (Ala.Crim.App.1999), aff'd, 779 So.2d 1283 (Ala.2000), cert. denied, 531 U.S. 1193, 121 S.Ct. 1194, 149 L.Ed.2d 109 (2001). In Ingram, we stated:
"Where the transcript or record is incomplete, two rules have evolved. The first applies to the situation where the appellant is represented on appeal by the same counsel that represented him at trial. In that case, the failure to supply a complete record is not error per se and will not work a reversal absent a specific showing of prejudice. In other words, in such a case, the appellant must show that failure to record and preserve the specific portion of the trial proceedings complained of visits a hardship upon him and prejudices his appeal. The second applies to the situation where the appellant is represented by new counsel on appeal. When he is *942 represented on appeal by counsel other than the attorney at trial, the absence of a substantial and significant portion of the record, even absent any showing of specific prejudice or error, is sufficient to warrant reversal."
779 So.2d at 1280-81.
In this case one of the attorneys represented Calhoun both at trial and on direct appeal. Thus, there is no per se prejudice. Ingram. Nor has Calhoun argued before this Court how he was prejudiced by the omission of this minor portion of the record. It is apparent what was discussed at the off-the-record conference because the circuit court returned and instructed the jury on the effect of a conviction for moral turpitude on a witness's credibility. Given that defense counsel announced that it was satisfied with the instructions given as a result of that bench conference we fail to see how Calhoun suffered any prejudice. See Spratt v. State, 833 So.2d 662, 666 (Ala.Crim.App.2002), and Owen v. State, 867 So.2d 1161, 1162 (Ala.Crim.App.2003). We decline to find any error here.

IV.
Calhoun argues that the State violated Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), by striking blacks from the venire.
The record reflects that after the jurors were struck the following occurred:
"The Court: Do we have any motions to take up at this time?
"[Defense counsel]: Just a second, Judge. We don't have anything to offer at this time.
"The Court: You don't have a Batson motion?
"[Defense counsel]: No, sir. We have examined the percentages of the venire, and based on the percentages that we have looked into and the reasons for strikes by the State, at this point we have no Batson motion.

"The Court: Let me ask you. You said you looked at the percentages. Would you state that into the record?
"[Defense counsel]: Yes, sir. There were 50 remaining on the panel after the challenges, and of that 12 of the panel were African-Americans which turns out to be roughly 24 percent of the panel. The following strikes, the State struck 8 of their 19 strikes or 42 percent who were African-Americans, but the panel makeup at this point, Judge, is 4 African-Americans of the 12 which is one-third that are sitting on the jury. One of the alternates is African-American. So, actually the percentage of the panel starting out was 24 percent, but the actual percentage of African-Americans sitting on the jury is 33 percent; and if you include the alternate it makes it 37 1/2 percent. It's actually more than what the original percentage of the panel was."
Although Alabama has never specifically addressed whether a Batson objection can be affirmatively waived rather than tacitly waived  other jurisdictions have considered this issue and have concluded that just like numerous other rights, a Batson objection may be waived. In Wardley v. State, 760 So.2d 774 (Miss.Ct.App.1999), the Mississippi Supreme Court considered whether an attorney could waive a Batson objection. In Wardley, the defendant claimed that he was denied the effective assistance of counsel because his attorney had an agreement with the prosecutor that neither would raise a Batson objection. The Mississippi Court of Appeals stated:
"There is no evidence that [the defendant] participated in the waiver of Batson. However, `a party is bound by the acts of his attorney.' Stringer v. State, *943 627 So.2d 326, 330 (Miss.1993). There are instances in which a defendant's personal waiver is required. Winters v. Cook, 489 F.2d 174, 178 (5th Cir.1973). The exceptional circumstances that have been identified as requiring a defendant's personal waiver of a relevant right may be grouped into two broad categories: first, where there is evidence of fraud, or gross negligence or incompetence on the part of the defendant's attorney; and, second, where an inherently personal right of fundamental importance is involved. Id. Among those rights which are considered personal fundamental rights are the decision whether to plead guilty or proceed to trial, Boykin v. Alabama, 395 U.S. 238, 242-43, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969); the decision whether to be tried by judge or jury, Adams v. United States ex rel. McCann, 317 U.S. 269, 275, 63 S.Ct. 236, 87 L.Ed. 268 (1942); the decision whether to appeal, Fay v. Noia, 372 U.S. 391, 439-40, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963); and the decision whether to forego [sic] the assistance of counsel Faretta v. California, 422 U.S. 806, 819, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). However, `the right to be indicted or tried by a constitutionally composed jury is not one of the rights traditionally considered so inherently personal that only the defendant may waive.' Winters, 489 F.2d at 180.
"Though Winters is not binding upon us, we find no contrary authority. In the antagonistic categories of those rights which can and those which cannot be waived by an attorney, the question of what few people are struck from a jury seems far less inherently personal than whether to plead guilty and end the trial, whether or not to appeal and end the case entirely, and whether or not to have a counsel act for the accused at all. Accordingly, we hold that [the defendant's] counsel could and did waive his rights under Batson v. Kentucky."
760 So.2d at 778. See Atkins v. State, 919 S.W.2d 770, 775 (Tex.Ct.App.1996) ("[A]ppellant's explicit waiver of his objection to the State's exclusion of [the prospective juror] precludes appellant from resurrecting this objection on appeal."). See also Mata v. Johnson, 99 F.3d 1261 (5th Cir. 1996), vacated in part on other grounds, 105 F.3d 209 (1997).
We agree with the Mississippi Supreme Court. Counsel waived any Batson objection by explicitly stating for the record that he had no Batson objection.
Moreover, the record fails to establish a prima facie case of racial discrimination. Therefore, the record fails to support a finding of plain error.

V.
Calhoun argues that the circuit court erred in failing to remove for cause prospective juror G.B. G.B. responded during voir dire questioning that he had heard something about the case. G.B. was then questioned individually and the following occurred:
"[Prosecutor]: [G.B.,] I had asked the question earlier did anybody know anything about the facts of the case, or read anything or saw anything on TV about it, and you answered in the affirmative somehow. Do you have any knowledge of the facts based on anything I've said?
"[G.B.]: No. Actually I haven't heard anything whatsoever until out in the hallway I heard somebody say there was going to be a murder case.
"[Prosecutor]: Do you even know who that person was?
"[G.B.]: Do I know who he was?
"[Prosecutor]: Yes, sir. Who was that?

*944 "[G.B.]: I believe his last name is Jones.
"[Prosecutor]: Is he a member of the jury panel or someone down here in the hall?
"[G.B.]: I believe he said he was a cousin of the guy that got murdered.
"[Prosecutor]: Were you involved in the conversation, or did you overhear that?
"[G.B.]: No, I just know him from previous acquaintance and just said hello to him, and he showed me a picture of the guy and said that was his cousin, and I guess he thought maybe I was going to be on the jury or something because at that time I had just got here.
"[Prosecutor]: Prior to today, when was the last time you talked with this Mr. Jones?
"[G.B.]: Three or four months ago. I was at work and he was working on the house next door, and I just knew him through a friend that I have, knew him when they was kids 20 something years ago, and I just recognized him.
"[Prosecutor]: Until the time you got here this morning or until we started voir diring or asking any questions about his particular case, did you have any idea what kind of case you were going to be on or possibly could be on?
"[G.B.]: No.
"[Prosecutor]: Did you have any idea that the case of John Russell Calhoun was set for trial?
"[G.B.]: No.
"[Prosecutor]: Based on what this man that showed you the picture and said something about a murder case, did you form any opinion about what he said?
"[G.B.]: No.
"[Prosecutor]: On the guilt or innocence of the defendant?
"[G.B.]: No.
"[Prosecutor]: Did he talk to you or relate to you any specific details about the case?
"[G.B.]: No.
"[Prosecutor]: He just said to you that there was going to be a murder case and showed you a picture. Did you know who the person was in the picture?
"[G.B.]: No, I don't even really  if you had put two pictures down there, I wouldn't know them apart.
"[Prosecutor]: But based on all of that, you have not formed any opinion about the guilt or innocence of the defendant?
"[G.B.]: No, sir.
"[Prosecutor]: Could you put aside any knowledge you have of the facts, what this guy said to you in the hall or anything else that you may have heard about his case, can you put that aside and render a verdict strictly on the law and evidence in this case should you be selected?
"[G.B.]: Sure."
(R. 421-24.) This juror did not serve on Calhoun's jury. Calhoun used one of his peremptory strikes to remove this juror.
The Alabama Supreme Court in Bethea v. Springhill Memorial Hospital, 833 So.2d 1 (Ala.2002), returned to the harmless-error analysis when reviewing a circuit court's refusal to remove a prospective juror for cause. The Supreme Court stated:
"The application of a `harmless-error' analysis to a trial court's refusal to strike a juror for cause is not new to this Court; in fact, such an analysis was adopted as early as 1909:
"`The appellant was convicted of the crime of murder in the second degree. While it was error to refuse to allow the defendant to challenge the juror C.S. Rhodes for cause, because of his having been on the jury *945 which had tried another person jointly indicted with the defendant, yet it was error without injury, as the record shows that the defendant challenged said juror peremptorily, and that, when the jury was formed the defendant had not exhausted his right to peremptory challenges.'
"Turner v. State, 160 Ala. 55, 57, 49 So. 304, 305 (1909). However, in Swain v. Alabama, 380 U.S. 202, 219, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), overruled on other grounds, Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the United States Supreme Court stated, in dicta, that `[t]he denial or impairment of the right is reversible error without a showing of prejudice.' (Emphasis added [in Bethea].) Some decisions of this Court as well as of the Alabama Court of Criminal Appeals reflect an adoption of this reasoning. See Dixon v. Hardey, 591 So.2d 3 (Ala.1991); Knop v. McCain, 561 So.2d 229 (Ala. 1989); Ex parte Rutledge, 523 So.2d 1118 (Ala.1988); Ex parte Beam, 512 So.2d 723 (Ala.1987); Uptain v. State, 534 So.2d 686, 688 (Ala.Crim.App.1988) (quoting Swain and citing Beam and Rutledge); Mason v. State, 536 So.2d 127, 129 (Ala.Crim.App.1988) (quoting Uptain).
"... [T]his Court has returned to the `harmless-error' analysis articulated in the Ross v. Oklahoma, 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988), and [United States v.] Martinez-Salazar, 528 U.S. 304, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000), decisions. Because a defendant has no right to a perfect jury or a jury of his or her choice, but rather only to an `impartial' jury, see Ala. Const. 1901 § 6, we find the harmless-error analysis to be the proper method of assuring the recognition of that right.
"In this instance, even if the Betheas could demonstrate that the trial court erred in not granting their request that L.A.C. be removed from the venire for cause (an issue we do not reach), they would need to show that its ruling somehow injured them by leaving them with a less-than-impartial jury. The Betheas do not proffer any evidence indicating that the jury that was eventually impaneled to hear this action was biased or partial. Therefore, the Betheas are not entitled to a new trial on this basis."[3]
833 So.2d at 6-7 (footnotes omitted). See also Dailey v. State, 828 So.2d 340 (Ala. 2001). As was the case in Bethea, Calhoun offers no evidence that the jury ultimately impaneled was biased; therefore, if error occurred it was harmless.
Moreover, even if we were to reach this issue the record clearly shows that this juror was not biased against Calhoun. The circuit court did not err in failing to remove this juror for cause.

VI.
Calhoun next challenges the admissibility of evidence that was introduced at his trial.

A.
Calhoun first argues that the circuit court erred in admitting into evidence the "rape kit" that had been collected from L.P. because, he says, it was not properly authenticated. Specifically he argues that the doctor who treated L.P. and collected the evidence did not testify to the details of the examination he performed on the victim.
*946 The record shows that there was no objection to the introduction of this evidence; therefore, we are limited to determining whether plain error exists. Rule 45A, Ala.R.App.P.
The record shows that Dr. Hamid Kamran, an emergency room physician at Citizens Baptist Medical Center, the hospital where L.P. was treated, testified that he performed a "rape kit" on her on the day that she was admitted to the hospital. Dr. Kamran testified that he procured a sealed "rape kit" from the hospital and proceeded to collect vaginal, anal, and oral swabs from L.P. He said that he then resealed the "rape kit" and turned it over to Officer Terry Truss of the Talladega Police Department. Officer Truss delivered the kit to Officer Ronnie Jones, who then delivered it to the state forensics laboratory.
Calhoun first argues that Dr. Kamran's testimony was elicited through leading questions and was inadmissible. Leading questions are frequently used to establish the predicate to introduce evidence. As this Court stated in Hodges v. State, 856 So.2d 875 (Ala.Crim.App.2001), aff'd, 856 So.2d 936 (Ala.), cert. denied, 540 U.S. 986, 124 S.Ct. 465, 157 L.Ed.2d 379 (2003):
"We have held that the trial court has discretion to allow or disallow a leading question, and the court's decision will not be reversed except for a flagrant violation. McWhorter v. State, 781 So.2d 257, 286 (Ala.Crim.App.1999) (quoting Taylor v. State, 666 So.2d 36, 63 (Ala.Crim.App.), opinion extended after remand, 666 So.2d 71 (Ala.Crim.App. 1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996)), aff'd, 781 So.2d 330 (Ala.2000), cert. denied, 532 U.S. 976, 121 S.Ct. 1612, 149 L.Ed.2d 476 (2001). There is absolutely no evidence that Hodges was prejudiced by the prosecutor's leading questions directed to these State witnesses who were called to establish the proper chain of custody for the admission of certain items of evidence."
856 So.2d at 922.
Moreover, the rape kit was authenticated. Sara Green, a nurse who assisted Dr. Kamran in collecting the samples for the rape kit, testified:
"Q [Defense counsel]: In this case do you remember what the procedure was in regard to Mrs. Phillips? Did you do a full body brush of Mrs. Phillips?
"A [Nurse Green]: No, that's not necessary. You would do  like a hair comb, you do the vaginal, anal, the mouth swabs. You would do like a pelvic combing of the pubic area, fingernail scraping, and then debris that would be on the body, they're placed over a piece of paper, and any debris that comes off is right there on that piece of paper, and it's all sealed."
(R. 1050.) There was no error in the admission of the rape kit at Calhoun's trial.

B.
Calhoun next argues that the circuit court erred in admitting the DNA evidence. He specifically argues that the forensic scientist, Angelo Della Manna, who performed the DNA tests, did not identify what type of test he performed on the evidence in this case, specifically, whether it was restriction fragment length polymorphism "RFLP" or polymerase chain reaction "PCR".
The record reflects that Calhoun never objected to the admissibility of the DNA evidence. We are limited to a plain-error analysis. See Rule 45A, Ala. R.App.P.
*947 Calhoun argues that the State failed to establish the reliability of the results. He cites Ex parte Perry, 586 So.2d 242 (1991), and Turner v. State, 746 So.2d 355 (Ala. 1998), in support of his argument.
We note that the standard articulated in Perry was superseded by Alabama's adoption of § 36-18-30, Ala.Code 1975. We no longer use the reliability test articulated in Perry; instead, § 36-18-30, Ala.Code 1975, guides the admission of DNA evidence. Section 36-18-30, Ala.Code 1975, provides:
"Expert testimony or evidence relating to the use of genetic markers contained in or derived from DNA for identification purposes shall be admissible and accepted as evidence in all cases arising in all courts of this state, provided, however, the trial court shall be satisfied that the expert testimony or evidence meets the criteria for admissibility as set forth by the United States Supreme Court in Daubert, et. ux., et. al., v. Merrell Dow Pharmaceuticals, Inc., [509 U.S. 579 (1993),] decided on June 28, 1993."
The Alabama Supreme Court in Turner v. State, 746 So.2d 355 (Ala.1998), adopted the Daubert test and set out the following two-part test that must be satisfied when introducing DNA evidence:
"I. Are the theory and the technique (i.e., the principle and the methodology) on which the proffered DNA forensic evidence is based `reliable'?
"II. Are the theory and the technique (i.e., the principle and the methodology) on which the proffered DNA evidence is based `relevant' to understanding the evidence or to determining a fact in issue?"
746 So.2d at 361 (footnotes omitted).
Calhoun first argues that the DNA evidence should not have been admitted because the expert did not identify what test he performed on the samples in this case. Though the expert did not specifically state the name of the test, this failure goes to the credibility of the DNA evidence, not to its admissibility. As this Court stated in Broadnax v. State, 825 So.2d 134, 174 (Ala.Crim.App.2000), aff'd, 825 So.2d 233 (Ala.2001), cert. denied, 536 U.S. 964, 122 S.Ct. 2675, 153 L.Ed.2d 847 (2002):
"We reject Broadnax's argument that because [the DNA expert] did not state the name of the particular method of DNA analysis performed  either PCR or RFLP  the theory and technique of the method of DNA analysis testified to in his trial was unreliable. Based on the record before us, we are convinced that the jury had enough information before it to determine the reliability of the DNA analyses and the weight to be given the evidence. The failure of testimony to name the DNA method used goes to the weight of the evidence, not its admissibility."
See also Lewis v. State, 889 So.2d 623 (Ala.Crim.App.2003).
Moreover, it is clear that Calhoun was aware of what particular DNA tests were performed in this case. Calhoun filed a discovery motion concerning the DNA evidence. This motion in part stated, "Provide documentation of any license and/or accreditation that the laboratory may hold for using the PCR methodologies for analysis of DNA evidence in forensic cases." (C.R. 217.) Also, Calhoun had his own DNA expert evaluate the procedures used by the State in conducting the DNA analysis of the evidence collected in this case. At the conclusion of Manna's testimony the following occurred:
"[Prosecutor]: Your Honor, we would offer Mr. Angelo Della Manna as an expert in the area of forensic DNA analysis. *948 At this time we would qualify him in that area, and that the scientific methods employed and the science of DNA are accepted in the scientific community, and that the procedures used were validated. They may have some voir dire.
"[Defense counsel]: We don't. Our expert agrees with that as they were done."
(R. 1209.) Calhoun specifically stated that he had no objection to the introduction of the DNA evidence. Calhoun waived any challenge to the admission of the DNA evidence.[4]
Moreover, Manna's detailed testimony was more than sufficient to comply with the two-part Daubert test. Manna testified, in part:
"Q [Prosecutor]: Is DNA testing of the type you used in this case routinely used in other forensic DNA laboratories in the United States and around the world?
"A [Mr. Manna]: Yes, it is.
"Q: For how long?
"A: Our first case in Alabama was in 1988, and the first DNA case in the United States was in Pennsylvania in 1986.
"Q: Are DNA test procedures in use by the Alabama Department of Forensic Sciences widely accepted in the scientific community as being reliable?
"A: Yes, they are.
"Q: And are you aware of published governmental studies which address the reliability and scientific validity of forensic DNA testing?
"A: Yes. The Nation Research Council, which is a collection of forensic scientists and DNA experts, put forth two reports, one in 1990 and the second in 1996, both affirming the validity and reliability of forensic DNA testing. In addition to that, the Office of Technology Assessment, which is the analytical arm of the United States Congress, also issued a report in 1990 again affirming that forensic DNA testing is indeed valid and reliable.
"Q: Has the DNA test procedures used in your department been scientifically validated?
"A: Yes, they have. Before a procedure is used in case-work analysis it has to undergo not only validation of the procedure but also validation internally within our laboratory itself. After it's gone through that extensive validation process and shown to produce reliable and valid results, only then is it used and implemented in forensic case work.
"Q: The DNA test procedures used by your department, have those DNA testing procedures, the theories under those, been published in scientific journals and presented at scientific meetings?
"A: Yes. There are numerous scientific journal articles as well as meetings and different symposiums hosted by forensic science societies as well as at the FBI Academy dealing specifically with DNA testing.
"Q: And what is TWGDAM or T-W-G-D-A-M?
"A: That is an acronym that stands for the technical working group on DNA analysis methods, and TWGDAM is a *949 collection of forensic scientists throughout the nation that come together to establish uniform standard guidelines for the crime laboratories nationwide so that all crime laboratories are performing the DNA testing processes in the same manner using the same types of controls and stringent levels and things of that nature, technical aspects of the DNA testing process as well as to set forth and recommend guidelines for the qualifications of personnel within a DNA testing laboratory and things of that nature.
"Q: Does your lab follow their recommended guidelines?
"A: Yes, we do.
"Q: Please describe the scientific controls used in the DNA test procedure which you follow to assure the test performs properly?
"A: The amount of controls implemented in the DNA testing process is indeed extensive. The very first control that we implement once the stain is identified  is the stain  and the standards from the individuals in the case are separated immediately, and at no time are they run in the same room or in the same space. The standards from the individuals in a particular case based on suspects in the case, for example, those standards are run separate in time and in space than the question stain of the crime scene sample. In addition, an additional control is the crime scene stain is running duplicate to insure the integrity of those results; and at each and every step of the analytical process of forensic DNA testing there is both a positive control and a negative control that is present at each step that acts as a flag to the analyst that allows us to know if there is a power surge in the laboratory or something did not go as planned; that that control would not function as designed.
"Q: And are there controls and things that help you determine whether your testing procedures are performing properly. Is that correct?
"A: That is correct.
"Q: Are there other controls such as periodic proficiency testing used by your department?
"A: Yes. Proficiency testing is part of a national guideline of standards which mandate that twice a year the proficiency on which I do forensic DNA testing has to be tested, and what that involves is an outside laboratory, outside the state of Alabama, creates a mock case where they have bloodstains, semen stains, saliva stains, and suspects and victims where they know who the source of those stains are. They then submit that to me, and I process that routinely just like I would a normal case and report those results back to them to insure that in fact, that yes I did interpret the DNA test correctly. That I did not make any errors in determining who could and couldn't be the source of those stains.
"Q: And you and your department have successfully completed and passed all those periodic proficiency testings. Is that correct?
"A: Yes.
"Q: In the DNA tests you performed in this case, did the controls indicate any errors may have occurred in the analytical process?
"A: No, they did not.
"Q: Were the controls you used run simultaneously with the tests in this case?

*950 "A: Yes, they were."
(R. 1201-05.)
Calhoun argues that there was no evidence indicating that the testing procedures were conducted pursuant to any guidelines. However, the testimony quoted above clearly shows that the DNA expert testified that the laboratory where the tests were performed followed the TWGDAM guidelines. TWGDAM is an acronym for technical working group on DNA analysis methods. "TWGDAM is a voluntary quality assurance group coordinated through the FBI and composed of 35 forensic scientists representing 22 state and local agencies around the county." Ex parte Brooks, 695 So.2d 184, 193 n. 3 (Ala. 1997). We have said that the TWGDAM guidelines satisfy the more stringent Ex parte Perry test. Smith v. State, 677 So.2d 1240 (Ala.Crim.App.1995).
Calhoun also challenges the admission of population-frequency statistical evidence. Specifically, he argues that there was no proper foundation established for the admissibility of the statistical information.
The DNA expert testified that population-frequency statistics were used to estimate the significance of DNA evidence. He said, "The population data base that I spoke of that we use has been shown, before it was used in case work, to be in compliance with the national frequencies." (R. 1229A.) He further testified that the statistical methods used in his laboratory were generally accepted in the scientific community. He also testified that quality controls were in place and that another scientist would come behind him and recalculate the population-frequency evidence.
"This Court has found population frequency statistics evidence reliable in numerous cases. See Thomas v. State, 824 So.2d 1 (Ala.Cr.App.1999); Williams v. State, 795 So.2d 753 (Ala.Cr.App.1999); Hammonds v. State, 777 So.2d 750 (Ala. Cr.App.1999)...."
Broadnax, 825 So.2d at 175. The population-frequency statistical information was correctly received into evidence. See also Moore v. State, 878 So.2d 328 (Ala.Crim. App.2003), and Tyson v. State, 784 So.2d 328 (Ala.Crim.App.), aff'd, 784 So.2d 357 (Ala.2000), cert. denied, 532 U.S. 1040, 121 S.Ct. 2003, 149 L.Ed.2d 1005 (2001).
Calhoun also argues that the DNA expert repeatedly referred to a match and grossly overstated the population-frequency statistics. However, we have reviewed the pages cited by Calhoun in his brief to this Court, and we find no support for Calhoun's assertion. There was no error in the admission of the DNA evidence.

C.
Calhoun argues that the circuit court erred in allowing an inaccurate map of the area where Calhoun was arrested to be received into evidence.
During Capt. Eugene Jacks's testimony the State introduced State's Exhibit 67  a drawing of the Coffee Street area  the general vicinity where Calhoun was apprehended the morning after the murder. The following occurred:
"Q [Prosecutor]: Eugene, let me show you this what's marked for identification purposes as State's Exhibit 67 and ask if you can identify that.
"A [Capt. Jacks]: Yes, sir. That's the drawing of the Coffee Street area from Johnson Street down to Ashton Place.
"Q: And would that be  actually it's not to scale though; is that correct?
"A: No, sir, it's not.
"Q: Is it a general representation of the Coffee Street area as the houses related to one another and as they relate to the street and alleyways themselves?

*951 "A: Yes, sir, it's the number of residences. They may be a little closer or further apart, but that's the way it's laid out.
"Q: A series of rectangles or squares adjacent to the area that's identified as Coffee Street and with numbers in each of those. What would those represent?
"A: That's the residence number or house number.
"....
"Q: Now in looking at these, you said it was not to scale. I know we have various house numbers on here, but whether they appear closer together in this one or some not so close together, that would be an accurate depiction of actually how they appear on the street themselves.
"A: That's correct.
"Q: So, for instances, if two houses appear to be somewhat close, they may be a little bit further apart in reality and vice versa. If they appear to be somewhat far apart, they might be closer in reality.
"A: Yes, sir.
"Q: This is just a general representation of the houses as they relate to the street.
"And the number of houses on the street, yes, sir.
"[Prosecutor]: We would offer 67, your Honor.
"The Court: It's in."
(R. 795-97.)
Calhoun argues that the inaccurate map should not have been allowed into evidence because, he argues, it prejudiced him. We do not agree. As the Alabama Supreme Court stated in Grandquest v. Williams, 273 Ala. 140, 135 So.2d 391 (1961):
"This court has held that blackboards and charts are admissible in evidence for use in clarification, explanation and for use by counsel in drawing inferences or making calculations based upon matters in evidence. McLaney v. Turner, 267 Ala. 588, 104 So.2d 315 [(1958)]. In ... State v. Crumbley, 27 N.M. 226, 199 P. 110 [(1921)], the witness made a rough sketch in the presence of the jury for the purpose of illustrating his testimony. The admission of the same in evidence was held not error although the witness admitted the sketch was not accurate in some particulars. In Hall v. Sera, 112 Conn. 291, 152 A. 148 [(1930)], a witness while on the stand drew a sketch indicating the relative position of cars as he saw them after a collision. The court explained that the accuracy of the sketch was a proper subject for cross-examination and the fact that it was not drawn to scale and was not an authenticated map of the locality did not render it inadmissible but only affected its weight. An inaccuracy, if it is misleading, is such a distortion as may be, by it very nature, corrected on cross-examination. In the case at bar the trial court said, `The jury can determine what's what.' The trial court obviously did not believe the inaccuracy was misleading."
273 Ala. at 148, 135 So.2d at 397.
The witness freely admitted that the drawing was not to scale. Any inaccuracies in the drawing could have been brought out during cross-examination; however, the defense did not cross-examine this witness. The circuit court committed no error in allowing State's Exhibit number 67 to be received into evidence.

D.
Calhoun argues that the circuit court erred in allowing the bite-mark comparison evidence to be introduced when, he says, no reliable collection procedure had been used in gathering the evidence. Specifically, *952 he argues that the photographs and the dental molds used by the experts to make the comparisons were improperly handled and labeled because the dental mold of Calhoun was not identified, on the mold itself, and because the photographs were not marked with name, date, and identification information.
The record shows that Calhoun filed a pretrial motion to suppress the bite-mark comparison evidence. In the motion Calhoun argued that the evidence should be suppressed because it was not collected in accordance with the American Board of Forensic Odontology guidelines. The circuit court held a lengthy hearing on the issue, at which both the State's expert and the defense's expert testified.
The State's expert, Dr. Michael A. Weems, a dental professor at the University of Alabama School of Dentistry, testified extensively as to his qualifications to make dental comparisons. Dr. Weems testified that Dr. Joseph Embry of the Alabama Department of Forensic Sciences had contacted him about making a dental comparison in this case. He stated that he received two set of dental molds  one from a dental impression that was made from L.P. and one from Calhoun. He testified, "[L.P.'s dental mold] was labeled on the model. Now they both came individually packaged in a sealed evidence bag that gave the date and the name, but it was not on the model itself on Calhoun." (R. 163.) He stated that some of the photographs of the bite marks were not clear so he chose only the sharpest photographs. Both Dr. Weems and the defense expert, Dr. Mario G. Martinez, a consultant at the University of Alabama in Birmingham School of Dentistry, testified that the photographs were "very well taken." Dr. Martinez testified that the photographs had no markings on the front but the names of Calhoun and L.P. were written on the back of one. Manna, the State's DNA expert, testified that the photographs were taken under his direction and were of L.P.'s neck, where there was a bite mark, and Calhoun's arm, where there was a bite mark. Both experts agreed that the bite mark on L.P.'s neck was consistent with Calhoun's dental impression and that the bite mark on Calhoun's arm was consistent with L.P.'s dental impression.
The forensic odontology test performed by both experts was accomplished by using physical comparisons. The Alabama Supreme Court in Ex parte Dolvin, 391 So.2d 677 (Ala.1980), held that this type of evidence was not subject to the stringent standards applied to scientific tests. As this Court stated in Handley v. State, 515 So.2d 121 (Ala.Crim.App.1987):
"Here, as in [Ex parte] Dolvin, [391 So.2d 677 (Ala.1980),] there was no scientific test or experiment. Rather, there was a physical comparison, as in Dolvin. In Dolvin, the court pointed out the following:
"`Alabama case law supports the admission of inter vivos photographs for the purpose of allowing the jury to compare the teeth of a human skull with those of the person depicted in the photograph. DeSilvey v. State, 245 Ala. 163, 16 So.2d 183 (1943). Expert testimony comparing inter vivos photographs with a human skull is a refinement and extension of this procedure, but is nonetheless admissible, assuming a proper predicate [of expertise] is laid.'

"Id. at 679-80.
"In a recent bite mark case of first impression in the State of Wisconsin, the court of appeals observed the following: `Currently, bite mark comparison has received evidentiary acceptance in nineteen jurisdictions. No jurisdiction has *953 rejected the admission of such evidence.' State v. Stinson, 134 Wis.2d 224, 228, n. 2, 397 N.W.2d 136, 137, n. 2 (1986). One of those jurisdictions which accept such testimony is Florida. The Supreme Court of Florida recognizes the Frye [v. United States, 293 F. 1013 (D.C.Cir. 1923)] standard, but in the recent case of Bundy v. State, 455 So.2d 330, 349 (Fla.1984), cert. denied, 476 U.S. 1109, 106 S.Ct. 1958, 90 L.Ed.2d 366 (1986), rejected the applicability of Frye to the admission of bite mark comparison and stated the following:
"`The evidence in question is based on the examination of impressions made by human teeth and their comparison with models of known human teeth for the purpose of determining whether the impressions were or probably were or could have been made by a particular individual. Bite mark comparison evidence differs from many other kinds of scientific evidence such as blood tests, "breathalyzer" tests, and radar (as well as from inadmissible techniques such as the polygraph and voice-print analyses) in that these various techniques involve total reliance on scientific interpretation to establish a question of fact. With bite mark evidence, on the other hand, the jury is able to see the comparison for itself by looking directly at the physical evidence in the form of photographs and models. People v. Slone, 76 Cal.App.3d 611, 143 Cal.Rptr. 61 (Cal.Ct.App.1978); People v. Marx, 54 Cal.App.3d 100, 126 Cal.Rptr. 350 (Cal.Ct.App.1975).'"
515 So.2d at 130-31.
Here, though the photographs did not have identifying marks on the front as recommended by the American Board of Forensic Odontology, the integrity of both the photographs and the dental molds was more than established by the witnesses who testified to their collection and their progression through the chain of custody. Calhoun presented his own expert who testified as to guidelines set out by the American Board of Forensic Odontology. We hold that the now-challenged omissions did not affect the admissibility of the bite-mark evidence but only its credibility. Cf. Broadnax, supra (failure to name DNA test performed on evidence not affected its admissibility but its credibility). The circuit court did not err in allowing the bite-mark comparison testimony to be received into evidence.

E.
Calhoun argues that the circuit court erred in admitting into evidence the emergency 911 telephone conversations because, he says, the calls were not properly authenticated. Specifically, he argues that the 911 operator who took the telephone call should have testified and the logbook should have been admitted into evidence. Calhoun did not object to the admission of the 911 telephone conversations. We evaluate this issue for plain error. Rule 45A, Ala.R.App.P.
Here, Misty Miller, a neighbor of the Phillipses who placed one of the 911 telephone calls, testified that she had reviewed the tape of the conversation and that it was an accurate recording of her conversation with the 911 operator on the night of the murder. She identified her voice on the tape. Also, L.P. testified that she made a 911 telephone call on the night of the murder and that the recording was an accurate account of her conversation with the 911 operator. Both parties who originated the 911 telephone calls testified and authenticated the tape recordings. As this Court reaffirmed in Adams v. State, [Ms. CR-98-0496, August 29, 2003] ___ So.2d ___ (Ala.Crim.App.2003), quoting *954 Johnson v. State, 823 So.2d 1, 23-25 (Ala. Crim.App.), cert. denied, 823 So.2d 57 (Ala. 2001):
"`"The proper foundation required for the admission of a sound recording into evidence depends on the circumstances of the case in which the admission is sought." Smith v. State, 727 So.2d 147, 167 (Ala.Crim.App.1998), aff'd, 727 So.2d 173 (Ala.), cert. denied, 528 U.S. 833, 120 S.Ct. 91, 145 L.Ed.2d 77 (1999). In Ex parte Fuller, 620 So.2d 675 (Ala.1993), the Alabama Supreme Court set out the two alternative methods of laying a foundation for the admissibility of sound recordings:
"`"The proper foundation required for admission into evidence of a sound recording or other medium by which a scene or event is recorded (e.g., a photograph, motion picture, videotape, etc.) depends upon the particular circumstances. If there is no qualified and competent witness who can testify that the sound recording or other medium accurately and reliably represents what he or she sensed at the time in question, then the `silent witness' foundation must be laid. Under the `silent witness' theory, a witness must explain how the process or mechanism that created the item works and how the process or mechanism ensures reliability. When the `silent witness' theory is used, the party seeking to have the sound recording or other medium admitted into evidence must meet the seven-prong Voudrie [v. State, 387 So.2d 248 (Ala. Crim.App.), cert. denied, 387 So.2d 256 (Ala.1980)] test. Rewritten to have more general application, the Voudrie standard requires:
"`"(1) a showing that the device or process or mechanism that produced the item being offered as evidence was capable of recording what a witness would have seen or heard had a witness been present at the scene or event recorded,
"`"(2) a showing that the operator of the device or process or mechanism was competent,
"`"(3) establishment of the authenticity and correctness of the resulting recording, photograph, videotape, etc.,
"`"(4) a showing that no changes, additions, or deletions have been made,
"`"(5) a showing of the manner in which the recording, photograph, videotape, etc., was preserved,
"`"(6) identification of the speakers, or persons pictured, and
"`"(7) for criminal cases only, a showing that any statement made in the recording, tape, etc., was voluntarily made without any kind of coercion or improper inducement.
"`"On the other hand, when a qualified and competent witness can testify that the sound recording or other medium accurately and reliably represents what the witness sensed at the time in question, then the foundation required is that for the `pictorial communication' theory. Under this theory, the party offering the item must present sufficient evidence to meet the `reliable representation' standard, that is, the witness must testify that the witness has sufficient personal knowledge of the scene or events pictured or the sounds recorded and that the item offered accurately and reliably represents the actual scene or sounds."
"`620 So.2d at 678.
"`Here, the State presented sufficient evidence of the authenticity of the tape recording of the 911 calls. Barry Rushakoff *955 testified that he had listened to the tape of the two 911 calls that he placed the night of the murder and that the tape was an accurate representation of what had transpired during those calls. Although Rushakoff did not identify all of the voices that can be heard in the background of the tape, positive identification of every sound on a tape recording is not necessary for its admission. See, e.g., Molina v. State, 533 So.2d 701, 711 (Ala.Crim.App.1988), cert. denied, 489 U.S. 1086, 109 S.Ct. 1547, 103 L.Ed.2d 851 (1989) (holding that videotape of defendant placing telephone call while being "booked" at the police station was properly admitted even though witness could not verify every word that the defendant spoke as one he personally heard; as long as "portions" of video and/or sound recordings are verified by a witness, the recordings are admissible). Rule 901(a), Ala.R.Evid., states that "authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Testimony of a witness with knowledge that the matter "is what it is claimed to be" is sufficient authentication to warrant admission. Rule 901(b)(1), Ala.R.Evid. Under the "pictorial communication" theory, Rushakoff's testimony was sufficient to authenticate the tape recording of the 911 calls. Any unidentified sounds or voices on the tape recording affected the weight and credibility of the tape, not its admissibility. Therefore, we find no error, plain or otherwise, in the admission of the tape recording of the 911 calls.'"
The conversations with the 911 telephone operator were properly authenticated and received into evidence.

VII.
Calhoun next argues that the circuit court erred in allowing Calhoun's mother, Patricia Garrett, to be called as a hostile witness without first establishing her "manifest hostility."
However, the record does not support Calhoun's rendition of the facts. Garrett was not called as a hostile witness but as a court's witness. The prosecutor stated the following:
"I intend on calling the defendant's mother, Patricia Garrett. I asked to call her as a court's witness. Obviously that's his mother, one. She's given a statement in which she admits to the defendant giving her a black pouch and she destroys it, and that in discussions with her relative to her statement and the tape, she even listens to the tape and still disputes some of the things that she says. She's obviously on the tape and she said, `Well, I don't remember saying that.' So obviously she's hostile to the state, and I ask to call her as the court's witness and be allowed to cross-examine."
(R. 1115.) The circuit court allowed Garrett to be called as a court's witness. After this discussion Calhoun never voiced any objection. Therefore, we review this issue for plain error. See Rule 45A, Ala. R.App.P.
Calhoun argues that the State failed to show Garrett's hostility. However, this Court recently in Snyder v. State, 893 So.2d 488 (Ala.Crim.App.2001) (opinion on remand from the Supreme Court), recognized that Rule 19.2, Ala.R.Crim.P., distinguishes between court witnesses and hostile witnesses. We stated in Snyder:
"Rule 19.2, Ala.R.Crim.P., states:
"`(b) Court Witnesses.
"`(1) Calling by Court. The court may, on its own motion or at the *956 suggestion of a party, call witnesses, and all parties are entitled to cross-examine witnesses thus called.
"`(2) Interrogation by Court. The court may interrogate witnesses, whether called by the court or by a party.
"`(3) Objections. Objections to the calling of witnesses by the court or to interrogation by the court may be made at the time the witness is called or interrogation begins; provided, however, that the court shall give counsel an opportunity to make such objections outside the presence of the jury.
"`(c) Hostile Witnesses. A party calling a witness may cross-examine the witness:
"`(1) If the witness demonstrates hostility to the party calling the witness, or
"`(2) If the testimony of the witness is necessary to prove a material matter essential to the case of the calling party and the party calling the witness is surprised by the testimony of the witness.'
"It appears that Rule 19.2 makes a distinction between a `court witness' and a `hostile witness.' The rule does not provide that a court witness must be hostile before the trial court may call that witness. This view is also consistent with the majority of other courts that have addressed this issue. See State v. Anderson, 304 S.C. 551, 406 S.E.2d 152 (1991) (before court may call witness five prerequisites must be met: (1) the state will not vouch for the truthfulness or integrity of witness, (2) there is a close relationship between the accused and the witness, (3) there is evidence indicating that the witness was an eyewitness to alleged act, (4) the witness has previously given a sworn statement that he will probably contradict, (5) and the absence of the witness's testimony would result in a miscarriage of justice); Uhr v. Lutheran Gen. Hosp., 226 Ill.App.3d 236, 256, 589 N.E.2d 723, 737, 168 Ill. Dec. 323, 338 (1992) (court may call witness `"where a witness has testimony relevant to the issues and a miscarriage of justice might occur if the testimony is not brought to the attention of the fact-finder"'). Compare Nance v. State, 93 Md.App. 475, 613 A.2d 428 (1992) (court may call witness when there is closer relationship between witness and defendant, there are contradictory statements made by witness, the witness's testimony is necessary, the witness is hostile, the prosecution cannot vouch for credibility)."
893 So.2d at 520-21.
There is no provision in Rule 19.2 that the witness must first be determined to be hostile before the court may call the witness as a court's witness. Certainly, Garrett's close relationship to Calhoun, the fact that she contradicted a prior statement given to police, and the fact that Calhoun had given her items to destroy that connected him to the murder were sufficient for the circuit court to call Garrett as a court's witness.

VIII.
Calhoun argues that the circuit court erred in allowing improper character evidence to be introduced. Specifically, he asserts that evidence of possible prior felony arrests was introduced during the testimony of Talladega Police Chief Allen Watson.
The record reflects that it was during Police Chief Watson's testimony that the 911 telephone calls were played to the jury. Only the 911 calls made by L.P. and her neighbor were introduced by the State. *957 Calhoun then played the remainder of the tape recording to the jury. One portion of the tape recording was a conversation between two police officers. During this conversation one police officer requested that a "10-29" be conducted on Calhoun. The following then occurred:
"Q [Defense counsel]: Just a question or two. What is a 10-29 in police code?
"A [Police Chief Watson]: That's checking warrants, wants on a subject.
"Q: On that tape did you hear a 10-29 requested on John Russell Calhoun?
"A: Yes, I did.
"Q: What was the response?
"A: Negative wants and warrants on him.
"Q: Thank you. No further questions.
"Redirect Examination by [Prosecutor]
"Q [Prosecutor]: And that was just local wants and warrants. Is that correct?
"A: That's correct.
"[Defense counsel]: I object, Judge.
"[Prosecutor]: Your Honor, he openly asked the question.
"The Court: Overrule.
"Q: She checked, told us the computer is down. Is that right?
"A: That's correct.
"Q: And she couldn't check the tag, and she checked, and she checked local warrants only. Is that correct?
"A: That's correct.
"[Defense counsel]: Object to the leading, Judge.
"The Court: Overrule.
"Q: Would local apply to what? Local warrants that 
"A: Warrants issued by the City of Talladega.
"Q: Which are only misdemeanors?
"A: Correct.
"Q: That's all."
(R. 624-25.)
The above testimony does not imply that Calhoun had felony arrests and convictions. The State was attempting to explain an issue that Calhoun had injected. As we have stated:
"`The appellant cannot be heard to complain ... "`about exploration of the issue ... which he himself improperly injected into the trial.' [Morgan v. State, 440 So.2d 1240, 1241 (Ala.Cr.App.1983)]. `Rebuttal evidence, even evidence of prior crimes, is generally admissible within the sound discretion of the trial court. Vincent v. State, 231 Ala. 657, 165 So. 844 (1936); Jones v. State, [362 So.2d 1303 (Ala.Cr.App.1978)]; Norris v. State, 429 So.2d 649 (Ala.Cr.App. 1982).' Peterson v. State, 452 So.2d 1372 (Ala.Cr.App.1984)." Campbell v. State, 508 So.2d 1186, 1189 (Ala.Cr. App.1986).'
"Walker v. State, 631 So.2d 294, 301 (Ala.Crim.App.1993). See also Butler v. State, 531 So.2d 52 (Ala.Crim.App.1988).
"Last, even if the statements were erroneously admitted, their admission was harmless beyond a reasonable doubt. See Chapman v. California, 386 U.S. 18 (1967). As the United States Supreme Court stated in United States v. Hasting, 461 U.S. 499 (1983):
"`In holding that the harmless-error rule governs even constitutional violations under some circumstances, [this] Court recognized [in Chapman v. California, 386 U.S. 18 (1967),] that, given the myriad safeguards provided to assure a fair trial, and taking into account the reality of the human fallibility of the participants, there can be no such thing as an error-free, perfect *958 trial, and that the Constitution does not guarantee such a trial....
"`Since Chapman, the Court has consistently made clear that it is the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless, including most constitutional violations.... The goal ... is "to conserve judicial resources by enabling appellate courts to cleanse the judicial process of prejudicial error without mired in harmless error."'"
Snyder v. State, 893 So.2d 488, 525 (Ala. Crim.App.2001) (opinion on remand from the Supreme Court). There was no improper character evidence presented in this case.

IX.
Calhoun argues that the circuit court erred in admitting improper hearsay testimony. He cites several different occurrences in the record to support this contention.

A.
Calhoun first argues that his mother was improperly allowed to testify as to statements he made to her. During Garrett's testimony the following occurred:
"Q [Prosecutor]: And you relate to him `Cody,[5] I done heard something,' didn't you?
"A [Garrett]: Yeah.
"Q: In fact you told him, `Cody, I done heard they said you done killed a man.'
"A: Yeah.
"Q: And what was his response when you said `Cody they said you done killed a man'?
"A: He said, `I don't know. I might have did.'
"Q: I don't know. I might have did.
"A: Uh-huh."
(R. 1118-19.)
Calhoun first argues that the statement, "Cody, I done heard they said you done killed a man," was inadmissible double hearsay. Hearsay is defined in Rule 801(c), Ala.R.Evid., as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." A "declarant" is defined as "a person who makes a statement." Rule 801(b), Ala.R.Evid.
Garrett's testimony as to the question she asked Calhoun was a previous statement made by her so it fails to meet the threshold inquiry into hearsay because it was not "a statement, other than one made by the declarant...." Neither was the statement offered to prove the truth of the matter asserted. It was offered to show Calhoun's response to the inquiry. Calhoun's response was clearly an admission by a defendant and was admissible because it was not hearsay. See Rule 801(d)(2)(A), Ala.R.Evid.

B.
Calhoun also argues that the circuit court erred in allowing two state witnesses to testify to statements that another witness had made to them.
The record shows that during Michael Spurling's testimony the State asked him about a conversation he had had with another neighbor, Linda Warwick, on the night of the murder about Calhoun's movements in the neighborhood. This conversation between Warwick and Spurling had been inquired into during defense counsel's cross-examination of Spurling. Spurling testified that Warwick was his neighbor *959 in a duplex he resided in and that on the night of the murder she beat on the adjoining wall to get his attention. During cross-examination defense counsel asked about the conversation between Spurling and Warwick. The following occurred on redirect by the State:
"Q [Prosecutor]: And you relate that in the same statement that [defense counsel] went into in that she had already related to you that [Calhoun] had left the vehicle and left the area before she ever went in and beat on the wall; is that correct?
"A [Spurling]: That's correct.
"Q: So he had left the area. She had observed him doing whatever he was doing at the car relative to the mask and other things, and then he had already 
"[Defense counsel]: Judge, I object.
"[Prosecutor]: You opened up the statement.
"The Court: Overruled.
"[Defense counsel]: This isn't cross-examination. This is their witness.
"[Prosecutor]: He went into the statement.
"The Court: He can finish up and make the statement complete."
(R. 911-12.) The circuit court's ruling was correct.
Rule 106, Ala.R.Evid., states:
"When a party introduces part of either a writing or recorded statement, an adverse party may require the introduction at that time of any other part of the writing or statement that ought in fairness to be considered contemporaneously with it."
The doctrine of completeness, as that concept is related in Rule 106, Ala.R.Evid., does not apply to oral conversations. As the Advisory Committee's Notes on Rule 106, Ala.R.Evid., state, in part:
"Rule 106 applies only to writings and recorded statements or parts thereof. This rule is not intended to affect preexisting Alabama applications of the completeness doctrine that lie outside the confines of Rule 106. The rule, for example, has no impact upon instances when the completeness doctrine is applied to unrecorded conversations. A prominent example of such an application, having continuing existence after adoption of Rule 106, is the rule that if one party proves any part of an unrecorded oral conversation or oral statement, the other party has the right to prove the relevant remainder of it. Abram v. State, 574 So.2d 986 (Ala. Crim.App.1990); Stockard v. State, 391 So.2d 1049 (Ala.Crim.App.1979), rev'd, 391 So.2d 1060 (Ala.1980)."
The Alabama Supreme Court in Stockard v. State, 391 So.2d 1060 (Ala.1980), held that the doctrine of completeness applied even if the remainder of the statement contained hearsay. The Supreme Court, in reversing this Court's decision, stated:
"We conclude that this holding by the Court of Criminal Appeals is in conflict with this Court's opinion in Logan v. State, 291 Ala. 497, 282 So.2d 898 (1973), wherein it was stated:
"`... [W]hen part of a conversation or transaction is put in evidence, the opposite party may rightfully call for the whole of it, although the evidence was in the first place illegal. Gibson v. State, 91 Ala. 64, 9 So. 171 [(1891)]. Further, it has been held that when the defendant, on cross-examination of a witness elicits part of a conversation, the State may in rebuttal show the entire conversation. Davis v. [State], 131 Ala. 10, 31 So. 569 [(1902)]; Flournoy v. State, 34 Ala. App. 23, 37 So.2d 218 [(1948)].'

*960 "It appears to us that the Court of Criminal Appeals, in applying the rule that one party can show the entire conversation when the opposing party has introduced a portion of it, made a distinction between admissible and inadmissible hearsay. We do not think that Logan authorizes such a distinction. The rule of admissibility has been explained in McElroy's Alabama Evidence as follows:
"`It is generally said, although sometimes loosely, that if one party proves any part of an oral conversation or oral statement, the other party has the right to prove all that was said on the same occasion [citing Logan v. State]. More correctly stated, the general rule is that only so much of the remainder of the statement or conversation is admissible as relates to the subject-matter of the part brought out by the opponent.'
"C. Gamble, McElroy's Alabama Evidence § 316.01 (1977). Thus, relevancy to the subject matter brought out is the standard by which a party might call for the remainder of a conversation partially proved by his opponent."
391 So.2d at 1064.
Moreover, Linda Warwick testified at Calhoun's trial and related what she had observed of Calhoun's movements on the night of the murder. "Testimony that may be apparently inadmissible may be rendered innocuous by subsequent or prior lawful testimony to the same effect or from which the same facts can be inferred." Yeomans v. State, 641 So.2d 1269, 1272 (Ala.Crim.App.1993). If there was any error it was harmless beyond a reasonable doubt. See Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

C.
Calhoun next argues that the circuit court erroneously allowed the State to question Dale Morris about his contact with Calhoun on the day of the murder.
The record shows that Dale Morris testified that on the day of the murder that he had seen Calhoun in a red Cavalier automobile  a car he had seen Calhoun driving on other occasions. He said that he spoke to Calhoun and in response, Calhoun pulled out a gun and pointed it at him. He described the gun as "a little black small gun," maybe a ".38 snub nose." On cross-examination, defense counsel challenged his knowledge of what type of gun, revolver or automatic, that Calhoun was carrying. Morris responded, "It's been so long ago, I can't remember what it was. All I know, it was a small black gun." (C. 812.) On redirect examination the State asked Morris about a statement that he had made immediately after the murder in which he had told police that he had opened the gun and it was not loaded. The State read a portion of this statement to the witness after the witness was still unable to recall what he had told police immediately after the murder.
Calhoun argues that the prosecutor should not have been allowed to read the statement into evidence because it was a writing used to refresh Morris's memory and the statement itself was not admissible. Calhoun cites the case of Parsons v. State, 251 Ala. 467, 38 So.2d 209 (1948), in support of this contention.
However, the Alabama Supreme Court in Parsons stated:
"[I]f the witness testifies to facts within his knowledge and memory, although refreshed by the memorandum, the memorandum is not admissible. It is admissible when after consulting it, she still does not remember the fact, but that she wrote the memorandum at the time of *961 the occurrence, and knew it was correct when she wrote it."
251 Ala. at 478, 38 So.2d at 217. Clearly, the holding in Parsons affirms the actions of the circuit court and does not support Calhoun's argument on appeal.[6]

D.
Calhoun last argues that the circuit court erred in allowing Officer Douglas Whaley to testify about an entry made in the dispatch log because, he says, the dispatch log was never authenticated. Specifically, he argues that Officer Whaley should not have been allowed to testify that he arrived at Coffee Street  the general area where Calhoun was arrested  at 10:30 p.m. according to the dispatch log. Calhoun did not object to this testimony; therefore, we review this issue for plain error. Rule 45A, Ala.R.App.P.
Even if the admission of this evidence was error, it was error without injury. Several other police officers testified as to the time police arrived at Coffee Street. Therefore, if error occurred it was harmless. Chapman v. California, supra.

X.
Calhoun argues that numerous instances of prosecutorial misconduct denied him a fair trial.
In Stallworth v. State, 868 So.2d 1128 (Ala.Crim.App.2001), cert. denied, 868 So.2d 1189 (Ala.), cert. denied, 540 U.S. 1057, 124 S.Ct. 828, 157 L.Ed.2d 711 (2003), this Court quoting in large part Davis v. State, 494 So.2d 851 (Ala.Crim. App.1986), stated the following about the role of a prosecutor and this Court's standard of review when evaluating claims of prosecutorial misconduct. This Court stated:
"`"It is, of course, the duty of every prosecutor to represent the interests of the state zealously, vigorously, and earnestly. His `responsibility [as] a public prosecutor differs from that of the usual advocate; [his] duty is not merely to convict, but also to protect the innocent.' EC7-13, Alabama Code of Professional Responsibility. `The prosecuting attorney owes a duty to exercise his full powers in furtherance of society's valid and strong interest in enforcement of criminal laws, not only in seeing that the guilty are punished but that criminal acts by others are discouraged by example of such punishment.' Sprinkle v. State, 368 So.2d 554, 561 (Ala.Cr.App.1978), writ quashed, 368 So.2d 565 (Ala.1979)."
"`The prosecutor's responsibility is eloquently explained in the following passage[:]
"`"`The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law. The twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor  indeed, he should do so. But, while he may strike hard *962 blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.
"`"`It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.'
"`"Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935)."
"`Initially, we observe that the trial court instructed the jury that comments of counsel were not evidence in the case. Also, we have repeatedly stated that, "`Statements of counsel in argument to the jury must be viewed as having been made in the heat of the debate, and such statements are usually valued by the jury at their true worth.'" Stephens v. State, 580 So.2d 11, 22 (Ala.Cr.App.1990), aff'd, 580 So.2d 26 (Ala.), cert. denied, 502 U.S. 859, 112 S.Ct. 176, 116 L.Ed.2d 138 (1991), quoting Harris v. State, 539 So.2d 1117, 1123 (Ala.Cr.App. 1988). Moreover, a prosecutor is free to argue his impressions of the evidence. Freeman, supra.
"`""In reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract. Whitlow v. State, 509 So.2d 252, 256 (Ala.Cr.App.1987); Wysinger v. State, 448 So.2d 435, 438 (Ala.Cr.App.1983); Carpenter v. State, 404 So.2d 89, 97 (Ala.Cr.App. 1980), cert. denied, 404 So.2d 100 (Ala.1981).'"
"`Callahan v. State, 767 So.2d 380, 392 (Ala.Cr.App.1999). For an argument by counsel to amount to reversible error it must "have so infected the trial with unfairness, taken in the context of the whole trial, that the appellant is entitled to a new trial. See Darden v. Wainwright, 477 U.S. 168, 181 (1986)." Holladay v. State, 629 So.2d 673 (Ala.Cr.App.1992), cert. denied, 510 U.S. 1171 (1994).'
"With these standards of review in mind, we evaluate the challenged comments and arguments of the prosecutor."
494 So.2d at 853.
While the failure to object will not bar our review of Calhoun's claims of prosecutorial misconduct, it will weigh against any claim of prejudice that Calhoun makes on appeal "`"because of its suggestion that the defense did not consider the comments in question to be particularly harmful."'" Ferguson v. State, 814 So.2d 925, 945 (Ala.Crim.App.2000), aff'd, 814 So.2d 970 (Ala.2001), cert. denied, 535 U.S. 907, 122 S.Ct. 1208, 152 L.Ed.2d 145 (2002), quoting Kuenzel v. State, 577 So.2d 474, 489 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.1991).

A.
Calhoun first argues that the prosecutor led witnesses on direct examination and restated every question to bolster the witnesses' testimony. Calhoun's brief on this issue contains a footnote that cites approximately 325 instances in the record in which he alleges the prosecutor *963 improperly led witnesses during direct examination. He argues that a prosecutor may never lead a witness during direct examination.
Rule 611(c), Ala.R.Evid., which addresses leading questions, states:
"Leading questions should not be used on the direct examination of a witness, except when justice requires that they be allowed. Leading questions are permitted on cross-examination. When a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions."
Alabama has never enforced an across-the-board ban on leading questions by a prosecutor during direct examination. "Every question may be said in some sense to be leading...." Donnell v. Jones, 13 Ala. 490, 507 (1848). As we stated in Williams v. State, 568 So.2d 354, 356-57 (Ala.Crim.App.1990):
"`Any question expressly or impliedly assuming a material fact not theretofore testified to, so that the answer may affirm such fact, is leading. Smith v. S.H. Kress & Co., 210 Ala. 436, 98 So. 378 [(1923)].' Ray v. State, 32 Ala.App. 556, 559, 28 So.2d 116, 118 (1946). `"[T]he trial judge has discretion to allow some leading questions, especially since prior testimony is simply being repeated." Brown Mechanical Contractors, Inc. v. Centennial Ins. Co., 431 So.2d 932, 944 (Ala.1983). "Whether to allow or disallow a leading question is within the discretion of the trial court and except for a flagrant violation there will not be reversible error." Bradford v. Stanley, 355 So.2d 328, 331 (Ala. 1978).' Lynn v. State, 543 So.2d 704, 707 (Ala.Cr.App.1987), affirmed, 543 So.2d 709 (Ala.1988), cert. denied, [493] U.S. [945], 110 S.Ct. 351, 107 L.Ed.2d 338 (1989). Thus, leading questions may be allowed on direct examination, depending on the circumstances of the particular case. Certain subjects are especially conducive to a leading form, `"else the counsel and witness cannot be made to understand each other,"' among them `"[p]roof of ... personal identity."' C. Gamble, McElroy's Alabama Evidence § 121.05(2) (3d ed. 1977)."
See also Evans v. State, 794 So.2d 415 (Ala.Crim.App.2000), and James v. State, 788 So.2d 185 (Ala.Crim.App.2000). We have refused to find error when a circuit court has allowed leading questions on preliminary matters that are not disputed, see Womble v. State, 44 Ala.App. 416, 211 So.2d 881 (1968); when a witness is hostile, see Dennis v. State, 584 So.2d 548 (Ala.Crim.App.1991); when a witness is immature, see McCurley v. State, 455 So.2d 1014 (Ala.Crim.App.1984); when a witness's memory has failed, see Garth v. State, 536 So.2d 173 (Ala.Crim.App.1988); and to establish the predicate for admission of a confession, see Jones v. State, 292 Ala. 126, 290 So.2d 165 (1974).
We have examined the instances cited by Calhoun in his brief and can find no instance where illegal evidence was admitted as a result of the prosecutor's leading questions. In the vast majority of instances no objections were made to the questions. There was no reversible error in the prosecutor's use of leading questions in this case.

B.
Calhoun next argues that the prosecutor repeatedly argued facts not in evidence. Calhoun lists several different instances in support of this contention.

1.
Calhoun challenges the following comment:[7]

*964 "You will hear evidence that there was blood on the Defendant's clothes that are recovered that are identified matching L.P. That being simply put that L.P.'s blood was on the Defendant's clothing. That there is also DNA matching the Defendant, vaginal swab of L.P. of the Defendant's semen, DNA, is a match."
(R. 591.) Specifically, Calhoun argues that the evidence showed that the semen sample was not collected from the vaginal swab taken from L.P.
Calhoun is correct. The DNA expert, Angelo Manna, testified that he tested the sperm collected from "genital swabbings" that had been taken from L.P. He said that because of the small amount of semen recovered from the genital swabbings he could not do extensive DNA testing on the sample. However, he said that he could do limited testing and those tests did not exclude Calhoun.
Nonetheless, we fail to see how the prosecutor's comment so infected Calhoun's trial with unfairness that he was denied a fair and impartial trial. See Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).

2.
Calhoun next challenges the following argument made in closing:
"We know that the testimony is that he placed his mouth on her sex organs. He forced her to place her mouth on his sex organs, and his sex organ penetrated her anus."
(R. 1493.) Calhoun argues that L.P. never directly testified that Calhoun's "sex organ penetrated her anus."
L.P. testified that Calhoun performed numerous acts that would support a conviction for sodomy. L.P. testified that as Calhoun was forcing her downstairs he put his fingers in her vagina. She said that when they reached the couch he licked her "private area" and when he could not get an erection he forced her to perform oral sex on him. At one point L.P. asked to go to the bathroom and when she was sitting on the toilet, she said, Calhoun placed his fingers in her vagina. L.P. testified that he forced her back to the couch and, "[H]e raped me on the couch with the gun anally and vaginally, and then he raped me with himself, and he pulled out and he ejaculated all over my stomach, and he wiped it off." (R. 659.) On cross-examination she testified:
"Q [Defense counsel]: Now when you get back to the sofa I think you testified earlier that he raped you with the gun anally and vaginally. Is that correct?
"A [L.P.]: Yes, sir.
"Q: And with himself again. Is that correct?
"A: Yes, sir, after that."
(R. 693-94.) L.P.'s testimony implies that Calhoun sodomized her with both the gun and with his penis. The prosecutor's argument was based on evidence that had been presented.

3.
Calhoun argues that the State manufactured evidence by mischaracterizing Calhoun's first visit to the Phillipses house. The prosecutor argued, "He didn't want to see that TV, but he cased the house out during that 10 or 15 minutes. He got the upstairs, the downstairs. He knew where the den was, he knew where the bedroom was." (R. 1487.) He argues that there was no evidence presented that *965 Calhoun was "casing" the Phillipses' house when he visited it earlier on the day of the murder.
Certainly, this was a legitimate inference that could have been drawn from the evidence presented, given the circumstances presented in this case.

4.
Calhoun argues that the prosecutor erroneously stated that Calhoun left with L.P.'s rings when there was no evidence indicating that the intruder left with any personal items.
L.P. testified that she gave Calhoun a handful of jewelry  among which were three rings.[8] She said that he threw some of the jewelry down but "a lot" of the jewelry was never recovered. The facts that jewelry was never recovered and that L.P. testified that she had given it to Calhoun, even though he threw some of it down, leads to the conclusion that Calhoun took some jewelry. There was no improper argument.

5.
Calhoun argues that during Officer Ronnie Jones's testimony the prosecutor testified to the significance of some evidence when he said, "And the red shirt being significant, had you known earlier in the day [Calhoun] has been seen in a red shirt?" (R. 1379.)
The record shows that during Officer Jones's testimony he stated that he had collected a red pullover shirt from Calhoun's mother's trailer. The prosecutor asked if Officer Jones knew the significance of the red shirt at the time it was collected  given that Calhoun had worn a red shirt during the murder. Officer Jones answered that he was aware that Calhoun had worn a red shirt at the time of the murder. The prosecutor's question was not improper.

C.
Calhoun argues that the prosecutor "denigrated Mr. Calhoun's right to consideration of lesser included offenses" when he argued in closing that Calhoun's request that the jury be allowed to consider lesser-included offenses was a "plea for sympathy." Calhoun did not object at the time; therefore, we review this issue for plain error. Rule 45A, Ala.R.App.P.
We have reviewed the prosecutor's argument and find that it was a legitimate argument based on the evidence presented. Counsel was arguing that the evidence did not support conviction on any lesser offenses and to convict Calhoun of an offense lesser than capital murder would amount to an act of sympathy. We have upheld similar arguments. See Wilson v. State, 777 So.2d 856, 898 (Ala.Crim. App.1999), aff'd, 777 So.2d 935 (Ala.2000), cert. denied, 531 U.S. 1097, 121 S.Ct. 826, 148 L.Ed.2d 709 (2001).
Also, the circuit court instructed the jury that arguments of counsel were not evidence in the case. The circuit court also instructed the jury on lesser-included offenses. We presume that the jury follows the circuit court's instructions. See Wilson.

D.
Calhoun argues that the prosecutor's characterization of the events on the night of May 8, as the "most horrible act that you could have ever committed," encouraged the jury to convict him based on the horrific nature of the crimes. He also challenges the prosecutor's comment that what the Phillips family experienced was the "great American nightmare."
*966 Certainly, given the events that occurred on May 8 the prosecutor's comments were not inappropriate; given the circumstances surrounding Calhoun's horrific actions in the Phillipses' house, they were more than appropriate. As we have stated:
"The controlling principles are found in 23A C.J.S. Criminal Law, Section 1102 (1961).
"`Comments by the prosecuting attorney which refer to, and make unfavorable inferences from, the conduct of accused in the course of the transaction for which he is on trial, or his conduct at any other time or place, or which refer to his character as shown by such conduct, or to his background, breeding, or associations, or to other details of his personal history or characteristics are proper, where the purported facts referred to by counsel are supported by competent evidence in the case, and where the inferences and deductions sought to be made from such facts are within the bounds of proper argument. On the other hand, remarks or argument of the prosecuting attorney concerning the character or conduct of accused, which is not supported by the record or which exceeds the limits of fair argument or inference is improper.
"`In a proper case, the prosecuting attorney may characterize accused or his conduct in language which, although it consists of invective or opprobrious terms, accords with the evidence in the case, and where the evidence warrants the belief that accused is guilty, the prosecutor may employ terms appropriate to the nature or degree of turpitude involved in the crime charged; but characterizations not justified by the evidence or the charge which the evidence tends to prove, and hence merely abusive, or which are couched in intemperate and inflammatory language are, ... improper.'"
Barbee v. State, 395 So.2d 1128, 1134-35 (Ala.Crim.App.1981).
Calhoun also challenges other comments made by the prosecutor. We have carefully reviewed all of the challenged instances, as well as the prosecutor's entire argument under a plain-error review, and are confident that nothing the prosecutor said during Calhoun's trial so infected his trial with unfairness that he is entitled to a new trial. See Darden v. Wainwright, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).

XI.
Calhoun argues that the capital charge of murder committed during the course of a robbery should not have been submitted to the jury because, he says, there was not sufficient evidence to prove his guilt on that charge. Specifically, he argues that there was no evidence indicating that he had the intent to rob before killing Tracy Phillips; therefore, the robbery was a mere afterthought and cannot support a capital-murder conviction. Calhoun argues that the only evidence presented of intent was that he had the intent to rape L.P. He argues, "Not only did the state fail to present any evidence at all to support a theory that Mr. Calhoun intended to rob when he killed Tracy Philips, it presented evidence to the contrary." (Calhoun's brief at page 2.) He cites testimony in the record that when Tracy Phillips offered him money he declined to accept it.
However, Calhoun's argument assumes that a defendant can only form the intent to commit one offense at the time that he commences a given course of conduct. As the Alabama Supreme Court stated in Ex parte Roberts, 735 So.2d 1270 (Ala.1999):

*967 "Although a taking of property committed after a murder and as a `mere afterthought' and unrelated to the murder will not sustain a conviction under § 13A-5-40(a)(2) for the capital offense of robbery-murder, see Bufford v. State, 382 So.2d 1162 (Ala.Crim.App.), cert. denied, 382 So.2d 1175 (Ala.1980), the question of a defendant's intent at the time of the commission of the crime is generally an issue for the jury to decide. Crowe v. State, 435 So.2d 1371, 1379 (Ala.Crim.App.1983). This Court held in Cobern v. State, 273 Ala. 547, 142 So.2d 869 (1962), that the fact that the victim was dead at the time the property was taken would not absolve a defendant of a charge of robbery if the intervening time between the murder and the taking of the property was such as to permit the jury to find that the murder and the taking were links in a continuous chain of events. See Thomas v. State, 460 So.2d 207 (Ala.Crim.App.1983), aff'd, 460 So.2d 216 (Ala.1984). To hold any other way `would be tantamount to granting to would-be robbers a license to kill their victims prior to [taking their property,] in the hope of avoiding prosecution under the capital felony statute.' 460 So.2d at 212....
"....
"The State had the burden of proving beyond a reasonable doubt that [the appellant] killed the victim during a robbery in the first degree. § 13A-5-40(a)(2), Ala.Code 1975. Section 13A-5-39(2) defines `during' as `in the course of or in connection with the commission of, or in immediate flight from the commission of the underlying felony or attempt thereof.' The Court of Criminal Appeals has stated that `[e]ven had the [defendant] killed the victim for some purpose unrelated to the theft, the taking of property from the victim after the murder constitutes robbery, as the murder and the subsequent taking of the property formed a continuous chain of events.' Johnson v. State, 479 So.2d 1377, 1380 (Ala.Crim.App.1985)."
735 So.2d at 1276-77.
Here, the evidence showed that Calhoun knew that the Phillipses were having a yard sale at their home. Calhoun approached L.P. early on the day of the murder as she was posting yard-sale signs. The signs indicated that a television would be offered for sale at the yard sale, and Calhoun went to the Phillipses' house to inquire about the television. L.P. testified that Calhoun came back to their house later that evening and that he was wearing a stocking mask over his head and was armed with a handgun. When Tracy Phillips offered him money he declined. Instead, Calhoun forced L.P. to strip and then forced her husband to put his head between his wife's legs. Calhoun then shot Tracy Phillips in the back of his head. He then raped, sodomized, and beat L.P. L.P. said that after he was finished raping her he said to her, "I know you have some money. Go upstairs and get it. I know your husband has some money. Go upstairs and get his wallet." (R. 660.)
Certainly, the evidence that was presented was more than sufficient for a jury to conclude that Calhoun intended to commit a robbery when he killed Tracy Phillips. This issue was correctly presented to the jury for its determination.
Calhoun further argues that the prosecutor's argument on the issue of the intent to commit robbery "led to a constitutionally infirm conviction." Calhoun challenges the following portion of the prosecutor's closing argument:
"Now, again, remember, intent to commit this robbery can be formed once he's already in. After he's done what he wanted to do to her and Tracy's dead, if *968 at that point in time, you remember during is during, before, and after the immediate flight therefrom. So if you think well, I think he went there to kill him, I think it was intentional murder, but I think he went there to rape, not to rob, well, remember that the intent to commit the robbery to take the property can be formed during the event. So the robbery, his intent when it was formed is not material here."

(R. 1490.) Calhoun specifically argues that the prosecutor's comment highlighted above tainted his conviction. Calhoun did not object to this argument; therefore, we review this issue for plain error. Rule 45A, Ala.R.App.P.
The record shows that before closing arguments the circuit court gave a lengthy instruction to the jury. The instruction told the jurors that statements of counsel were not evidence and that it would instruct them on the law. The circuit court also gave the same instruction to the jurors before opening statements. The prosecutor also stated in his closing argument, "If I say something that's different than the judge tells you the law is, because he's the final say, I don't do it intentionally." (R. 1479-80.)
We do not believe, given the circumstances of this case, that the comment so infected the proceedings with unfairness that Calhoun was denied a fair trial. Darden v. Wainwright, supra. If we consider the comment in the entirety of the prosecutor's argument it would appear that the prosecutor was arguing that based on the evidence presented in this case there was no question that Calhoun intended to commit robbery. The intent to commit the underlying felony may be formed during the murder. Padgett v. State, 668 So.2d 78 (Ala.Crim.App.), cert. denied, 668 So.2d 88 (1995).
Moreover, the circuit court gave a detailed instruction on the issue of intent. We presume that jurors follow the circuit court's instructions. Wilson, supra. We decline to find plain error here.

XII.
Calhoun argues that the circuit court erred in allowing improper victim-impact evidence at the guilt-phase of his capital trial. Specifically, he argues that the Phillipses' two children who testified at the guilt phase presented improper victim-impact evidence. T.G.P., the victims' son, testified that he was named after his father. T.P., the victims' daughter who was present when her father was shot, was asked what she did after the intruder shot her father and left the room with her mother; she replied that she went to her father and kissed him on the cheek, hoping that he would wake up and tell her what to do.
While portions of the children's testimony served no purpose at the guilt phase of the proceedings, we are more than confident that this testimony had no prejudicial impact on Calhoun's trial. See Adams v. State, [Ms. CR-98-0496, August 29, 2003] ___ So.2d ___ (Ala.Crim.App.2003) (questioning concerning victim's family and his children at the guilt phase did not result in reversible error); Centobie v. State, 861 So.2d 1111 (Ala.Crim.App.2001), cert. denied, 861 So.2d 1145 (Ala.2003) (eliciting testimony at guilt phase from victim's spouse about 15-month-old child did not constitute reversible error); McGriff v. State, 908 So.2d 961 (Ala.Crim.App.2000), rev'd on other grounds, 908 So.2d 1024 (Ala.2004), on application for reh'g, 908 So.2d 1024 (eliciting testimony at the guilt phase of capital trial that victim was married and had a young child not reversible error). See also McGowan v. State, [Ms. CR-95-1775, December 12, 2003] ___ *969 So.2d ___ (Ala.Crim.App.2003); Clark v. State, 896 So.2d 584 (Ala.Crim.App.2000); Smith v. State, 756 So.2d 892 (Ala.Crim. App.1997), aff'd, 756 So.2d 957 (Ala.), cert. denied, 531 U.S. 830, 121 S.Ct. 82, 148 L.Ed.2d 44 (2000).
As the Alabama Supreme Court stated in Ex parte Rieber, 663 So.2d 999 (Ala. 1995):
"It is presumed that jurors do not leave their common sense at the courthouse door. It would elevate form over substance for us to hold, based on the record before us, that [the appellant] did not receive a fair trial simply because the jurors were told what they probably had already suspected  that [the victim] was not a `human island,' but a unique individual whose murder had inevitably had a profound impact on her children, spouse, parents, friends, or dependents (paraphrasing a portion of Justice Souter's opinion concurring in the judgment in Payne v. Tennessee, 501 U.S. 808, 838, 111 S.Ct. 2597, 2615, 115 L.Ed.2d 720 (1991))."
663 So.2d at 1006.
Calhoun also argues that the prosecutor injected improper prejudicial victim-impact evidence during his closing argument when he commented on what could have been on T.P.'s mind when she witnessed her father being killed.
Given the evidence presented in this case, it was not unreasonable to comment on T.P.'s thoughts as she witnessed Calhoun's actions. T.P. testified that she witnessed the events and she identified Calhoun as the killer. We believe that any comment on what was in T.P.'s mind as she watched her father being killed and her mother being brutalized was not improper.

XIII.
Calhoun next argues that the circuit court erred in its instructions to the jury in the guilt phase. He states several different grounds in support of this contention.
The record shows that after the jury instructions were given in the guilt phase Calhoun announced that he was satisfied. There were no objections to the instructions or the verdict forms; therefore, we review this issue for plain error. Rule 45A, Ala.R.App.P. Although the failure to object to a jury instruction in a death-penalty case will not prevent this court from reviewing the issue it will weigh against any claim of prejudice that the appellant makes on appeal. Ex parte Boyd, 715 So.2d 852 (Ala.1998).
When reviewing jury instructions we must review the instructions as a whole and as a reasonable juror would have interpreted them. See Ingram v. State, 779 So.2d 1225 (Ala.Crim.App.1999), aff'd, 779 So.2d 1283 (Ala.2000), cert. denied, 531 U.S. 1193, 121 S.Ct. 1194, 149 L.Ed.2d 109 (2001).

A.
Calhoun first argues that the jury instructions and the verdict forms did not allow the jury to consider all of the lesser-included offenses.
Calhoun argues that the circuit court did not allow the jury to convict him of both the murder and the underlying felony for each capital-murder count. In essence Calhoun argues that the circuit court deprived him of an instruction on felony murder for each count of capital murder for which he was charged.
There was no reasonable basis to charge the jury on the lesser offense of felony murder. The crime of felony murder is reserved for those situations where an unintended death occurs as a result of a defendant's dangerous conduct. Here, the *970 manner of the killing  shooting Phillips in the back of the head at point-blank range  showed that the murder was intentional. The circuit court did not err in failing to instruct the jury on felony murder. See Dunaway v. State, 746 So.2d 1021 (Ala.Crim.App.1998), aff'd, 746 So.2d 1042 (Ala.1999).

B.
Calhoun argues that the circuit court's instruction on reasonable doubt violated Cage v. Louisiana, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990), because it lessened the State's burden of proof. He specifically challenges the circuit court's use of the term "moral certainty."
The United States Supreme Court in Cage v. Louisiana held that a trial court's instructions on reasonable doubt that contained the terms "moral certainty," "grave uncertainty," and actual substantial doubt" lessened the State's burden of proof and were improper.
"The use of the term `moral certainty' alone in defining reasonable doubt did not create the error defined and discussed in Cage v. Louisiana, supra; rather, it was the use of the this term in conjunction with other terms, such as `grave uncertainty' and `actual substantial doubt,' that served to lessen the burden of proof."
Price v. State, 725 So.2d 1003, 1021 (Ala. Crim.App.1997).
The circuit court's instructions here, although they contained the term "moral certainty," adequately conveyed the concept of reasonable doubt. The court stated that a reasonable doubt was a doubt for which the jurors could attach a reason. The circuit court's instructions on reasonable doubt did not violate Cage v. Louisiana, supra.

Penalty Phase Issues

XIV.
Calhoun first challenges several arguments made by the prosecutor in the penalty phase.

A.
Calhoun contends that his conviction should be reversed because the prosecutor compared the rights of the victim to his rights. Specifically, the prosecutor argued that Calhoun's mother got to plead for his life but that Tracy Phillips's mother did not get to plead for her son's life and that Tracy Phillips did not get a sentencing hearing.
We have examined the prosecutor's remarks and agree with the words of this Court in McNair v. State, 653 So.2d 320 (Ala.Crim.App.1992):
"The prosecutor made numerous references to the victim's rights and several times implied that her rights were to be weighed against the appellant's. This was clearly improper. However, we think these references were valued by the jury at their true worth, as having been uttered in the heat of debate and were not expected to become factors in the formation of the verdict. See Duren v. State, 590 So.2d 360, 364 (Ala.Cr.App. 1990), affirmed, 590 So.2d 369 (Ala.1991), cert. denied, 503 U.S. 974, 112 S.Ct. 1594, 118 L.Ed.2d 310 (1992); Bankhead v. State, 585 So.2d 97, 106 (Ala.Cr.App. 1989), affirmed as to instant issue and remanded on other grounds, 585 So.2d 112 (Ala.1991) (on rehearing), affirmed on return to remand, 625 So.2d 1141 (Ala.Cr.App.1992); Harris v. State, 539 So.2d 1117, 1123 (Ala.Cr.App.1988)."
653 So.2d at 337-38. We decline to find any plain error.

*971 B.
Calhoun also argues that the prosecutor misstated the law relating to the jury's weighing the aggravating and the mitigating circumstances when he made the following argument:
"I just want to talk to you just a minute about the procedure and the verdict forms. Procedure is this. You weigh the aggravating circumstance proved to you beyond a reasonable doubt, and we know that's four. You know what they are. Then you weigh that against the mitigating circumstances proved to you. Statutorily there are none. I submit to you there are none. The only thing left is the nonstatutory mitigation, and that's his mother coming up here and asking you to spare his life, and she wants her son to live. I had no question of her. I have no problem with that.... So, I submit to you that's only under nonstatutory. Let's say for some stretch that you believe that. That's one, and we've proven four; and I believe without question ours outweigh what, if any, they have proved  if they're proved any of the nonstatutory, his mother asking you to spare his life, and that's all."
(R. 1652-53.) He asserts that the above argument implied to the jurors that the process of weighing the aggravating and the mitigating circumstances was strictly a numerical test.
Earlier in closing the prosecutor argued:
"So, at this time I believe beyond a reasonable doubt the State has proved four aggravating circumstances. Now it's not, as [defense counsel] and the Judge will tell you, it's not we prove four, and they prove none, or we prove four, and they prove one, and ours out-numbers. It is the weight. And what weight do you give that."
(R. 1649.) Given the prosecutor's entire argument we decline to find any plain error.

C.
Calhoun argues that the prosecutor's argument that mitigation was just another way of asking for sympathy rendered his sentence unconstitutional. Calhoun did not object to that argument at trial; therefore, we review this issue for plain error. Rule 45A, Ala.R.App.P.
While we do not condone the prosecutor's comment, we are confident that it did not so infect the proceedings with unfairness that Calhoun was denied a fair trial. Darden v. Wainwright.

D.
Calhoun last argues the prosecutor and the circuit court denigrated the jury's sense of responsibility by stating that the jury's verdict in the penalty phase was a recommendation. We have repeatedly upheld similar comments because they are a correct statement of Alabama law. See Snyder v. State, 893 So.2d 488 (Ala.Crim.App.2003) (opinion on remand from the Supreme Court); Taylor v. State, 666 So.2d 36, 50-51 (Ala.Crim.App.1994), aff'd, 666 So.2d 73 (Ala.1995); Burton v. State, 651 So.2d 641 (Ala.Cr.App.1993), aff'd, 651 So.2d 659 (Ala.1994); White v. State, 587 So.2d 1218 (Ala.Cr.App.1990), aff'd, 587 So.2d 1236 (Ala.1991).

XV.
Calhoun argues that the jury improperly considered a nonstatutory aggravating circumstance when the State elicited improper testimony from Calhoun's mental-health witness in the penalty phase.
The record reflects that Dr. Alvin Sheeley, a psychologist, testified for Calhoun during the penalty phase. Dr. Sheeley *972 testified that he had evaluated Calhoun and that it was his opinion that Calhoun was close to meeting the criteria for the diagnosis of an impulse-control disorder. On cross-examination, the State asked Dr. Sheeley about his interview with Calhoun, specifically if Dr. Sheeley remembered what Calhoun was doing during the interview. Dr. Sheeley replied that Calhoun had been "fondling himself." (R. 1633.)
Calhoun argues on appeal that this information was highly inflammatory and that it had the power to elicit a recommendation of a sentence of death from the jury. There is absolutely no indication that this information was considered by the jury as an aggravating circumstance. The circuit court specifically instructed the jury on the statutory aggravating circumstances and stated that it could not consider any other evidence as aggravating. We presume that jurors follow a court's instruction. Wilson, supra. We decline to find plain error.

XVI.
Calhoun argues that the jury instructions in the penalty phase were flawed for several reasons.

A.
Calhoun first argues that the jury instruction concerning mitigating circumstances implied to the jury that its findings on mitigating circumstances had to be unanimous. Specifically, he argues that the jury instruction violated Mills v. Maryland, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988). The United States Supreme Court in Mills v. Maryland held that if there was a substantial probability that a jury instruction in the penalty phase of a capital trial implied that a finding on a mitigating circumstance must be unanimous the death sentence must be vacated.
Calhoun did not object to the jury instructions in the penalty phase; therefore, we review this issue for plain error. Rule 45A, Ala.R.App.P.
As we stated in Tyson v. State, 784 So.2d 328 (Ala.Crim.App.), aff'd, 784 So.2d 357 (Ala.2000):
"The appellate courts of this state have consistently held, since the United States Supreme Court's decision in Mills, that as long as there is no `reasonable likelihood or probability that the jurors believed that they were required to agree unanimously on the existence of any particular mitigating circumstances,' there is no error in the trial court's instruction on mitigating circumstances. Freeman [v. State], 776 So.2d [160] at 195 [(Ala.Crim.App.1999)]. See also Ex parte Martin, 548 So.2d 496 (Ala.1989), cert. denied, 493 U.S. 970, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989); Williams v. State, 710 So.2d 1276 (Ala.Cr.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998); Brown v. State, 686 So.2d 385 (Ala.Cr.App.1995); Rieber v. State, 663 So.2d 985 (Ala.Cr.App.1994), aff'd, 663 So.2d 999 (Ala.), cert. denied, 516 U.S. 995, 116 S.Ct. 531, 133 L.Ed.2d 437 (1995); Holladay v. State, 629 So.2d 673 (Ala.Cr.App.1992), cert. denied, 510 U.S. 1171, 114 S.Ct. 1208, 127 L.Ed.2d 555 (1994)."
784 So.2d at 351.
We have carefully reviewed the circuit court's jury instruction on mitigating circumstances and find no likelihood that the jury would have believed that its finding as to the existence of mitigating circumstances had to be unanimous. In fact, the instructions were similar to the pattern jury instructions. See Freeman v. State, 776 So.2d 160 (Ala.Crim.App.1999), aff'd, 776 So.2d 203 (Ala.2000).

*973 B.
Calhoun argues that the circuit court's instructions on weighing the aggravating and the mitigating circumstances were erroneous because they did not instruct the jury that if it determined that the aggravating and the mitigating circumstances were of equal weight then it must fix the recommendation at life imprisonment without the possibility of parole.
Here, Calhoun did not object to this instruction; therefore, we review this issue for plain error. Rule 45A, Ala. R.App.P.
"[A]lthough the court did not specifically instruct the jury what to do if it found the mitigating and aggravating circumstances equally balanced, we cannot conclude, considering the charge in its entirety, that the error `seriously affect[ed] the fairness, integrity or public reputation of [these] judicial proceedings,' Ex parte Davis, 718 So.2d [1166] at 1173-74 [(Ala.1998)], so as to require a reversal of the sentence."
Ex parte McNabb, 887 So.2d 998, 1004 (Ala.2004).
We, like the McNabb court, conclude that based on the charge given to the jury the error did not seriously affect the fairness of the judicial proceedings. According we find no plain error.

C.
Calhoun argues that the circuit court erred in instructing the jury that its verdict in the guilt phase had already established that the murder was committed during the course of a rape, robbery, and a burglary. Because Calhoun failed to object to the jury instructions in the penalty phase, we review this issue for plain error. Rule 45A, Ala.R.App.P.
First, Calhoun argues that it was error to instruct the jury that the single aggravating circumstance set out in § 13A-5-49(4), Ala.Code 1975, applied three times in his case. Basically Calhoun argues that no matter how many of the enumerated felonies contained in § 13A-5-49(4) are committed during the course of one murder, only one aggravating circumstance is present.
In Stewart v. State, 730 So.2d 1203 (Ala. Crim.App.1996) (opinion on second return to remand), aff'd, 730 So.2d 1246 (Ala. 1999), we specifically held otherwise. We stated:
"We hold that the aggravating circumstance enumerated in § 13A-5-49(4) may apply more than once if the accused murders another while committing any variation of the four enumerated felonies contained in § 13A-5-49(4), Code of Alabama 1975. The appellant committed the murder during the course of committing two felonies: burglary and kidnapping. The fact that § 13A-5-49(4) lists four different felonies under the single heading of aggravating circumstances does not mean that this circumstance could be applied only once in any given case. To hold otherwise would be to say that a person could commit a murder during the course of committing any number of the felonies enumerated in § 13A-5-49(4) and face no additional consequences at the penalty phase and in fact be considered to have committed only one of the felonies contained in this section. This was not the intent of the legislature. The legislature's use of the words or in the above section supports this holding.
"Furthermore, § 13A-5-48 states:
"`The process described in Sections 13A-5-46(e)(2), 13A-5-46(e)(3) and Section 13A-5-47(e) of weighing the aggravating and mitigating circumstances to determine the sentence shall not be defined to mean a mere *974 tallying of aggravating and mitigating circumstances for the purpose of numerical comparison. Instead, it shall be defined to mean a process by which circumstances relevant to sentence are marshalled and considered in an organized fashion for the purpose of determining whether the proper sentence in view of all the relevant circumstances in an individual case is life imprisonment without parole or death.'
"(Emphasis added.) Our conclusion is further supported by the above Code section, which states that the weighing of the aggravating and the mitigating circumstances is not a mere tallying of numerical numbers and comparing those numbers to see which is greater."
730 So.2d at 1212. See also Hodges v. State, 856 So.2d 875 (Ala.Crim.App.2001). Here, the murder was committed during the course of a rape, sodomy, robbery, and burglary. Three of those felonies constitute aggravating circumstances as set out in § 13A-5-49(4). Therefore, at the guilt phase of Calhoun's trial three aggravating circumstances had already been proven to the jury's satisfaction beyond a reasonable doubt.
Second, Calhoun asserts that such an instruction "improperly subsumed the jury's role as an independent evaluator of the aggravating and the mitigating circumstances." (Calhoun's brief at page 106.) However, we have upheld similar instructions, see Snyder v. State, 893 So.2d 488 (Ala.Crim.App.2003), as correct statements of the law.

XVII.
Calhoun argues that Alabama's method of execution, electrocution, constitutes cruel and unusual punishment. However, after Calhoun was sentenced the legislature amended Alabama's death penalty statute to provide for execution by lethal injection.
"The Alabama Legislature modified § 15-18-82, Ala.Code 1975, to provide for lethal injection as a method of execution. This Court has held that the legislative amendment has rendered moot an appellant's claims that electrocution as a method of execution violates constitutional principles. See, e.g., McGowan v. State, [Ms. CR-95-1775, Dec. 12, 2003] ___ So.2d ___, ___ (Ala.Crim.App. 2003), and cases cited therein."
Yeomans v. State, 898 So.2d 878, 900 (Ala. Crim.App.2004). This claim is now moot.

XVIII.
Calhoun argues that the cumulative effect of the alleged errors denied him a fair trial.
However, as we have stated, "Because we find no error in the specific instances alleged by the appellant, we find no cumulative error." Lane v. State, 673 So.2d 825 (Ala.Crim.App.1995). See also McGriff v. State, 908 So.2d 961 (Ala.Crim.App.2000).

Sentencing Order

XIX.
Calhoun argues that the circuit court's order sentencing him to death is deficient for the following reasons.

A.
First, Calhoun argues that the order shows that the circuit court failed to consider and find any nonstatutory mitigating circumstances. He argues, "a new sentencing hearing is required when a trial court fails to find the existence of mitigation before it." (Calhoun's brief at page 21.)
As the Alabama Supreme Court stated in Ex parte Giles, 632 So.2d 577 (Ala.1993):
"We are aware of no authority for Giles's legal proposition that these [mitigating] *975 factors, assuming they were conclusively established, mandate a sentence of life imprisonment. Although evidence of nonstatutory factors, such as that presented by Giles, cannot be excluded from the sentencing tribunal, Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), such evidence is only `potentially mitigating.' Skipper v. South Carolina, 476 U.S. 1, 7, 106 S.Ct. 1669, 1672, 90 L.Ed.2d 1 (1986) (emphasis added). The sentencing tribunal, and, on appeal, the reviewing court, determines the weight to be assigned to each factor. Ex parte Hart, 612 So.2d 536 (Ala.1992), cert. denied, Hart v. Alabama, [508] U.S. [953], 113 S.Ct. 2450, 124 L.Ed.2d 666 (1993); Smith v. State, 407 So.2d 894 (Fla.1981), cert. denied, 456 U.S. 984, 102 S.Ct. 2260, 72 L.Ed.2d 864 (1982)."
632 So.2d at 585.
Here, after discussing the statutory mitigating circumstances, the circuit court's sentencing order states:
"The Court has made a diligent search under the provisions of Section 13A-5-52, [which governs nonstatutory mitigation,] the evidence offered by [Calhoun], and aspects of the Presentence Report favorable to [Calhoun] on mitigation to determine if there is any aspect of [Calhouns's] character or record or any circumstance of the offense for which he has been convicted that would constitute a mitigating circumstance and finds that there is no mitigating circumstance."
(C.R. 147.)
The circuit court must consider evidence offered in mitigation, but it is not obliged to find that the evidence constitutes a mitigating circumstance. As the Alabama Supreme Court has stated:
"See Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); Ex parte Hart, 612 So.2d 536, 542 (Ala.1992) (`Lockett does not require that all evidence offered as mitigating evidence be found to be mitigating.'), cert. denied, 508 U.S. 953, 113 S.Ct. 2450, 124 L.Ed.2d 666 (1993); and Ex parte Slaton, 680 So.2d 909, 924 (Ala.1996) (`"While Lockett and its progeny require consideration of all evidence submitted as mitigation, whether the evidence is actually found to be mitigating is in the discretion of the sentencing authority."') (quoting Bankhead v. State, 585 So.2d 97, 108 (Ala.Crim.App.1989), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997))."
Ex parte Ferguson, 814 So.2d 970, 976 (Ala.2001). The circuit court complied with Lockett and we agree with its findings.

B.
Second, Calhoun argues that because the circuit court referred to the murder of Tracy Phillips as brutal and merciless that it applied an aggravating circumstance not set out in the statute.
The record shows that in the circuit court's findings of fact in regard to the sentencing phase,[9] the circuit court stated, "The Court finds that the conduct of the defendant constituted a brutal, aggravated, merciless and intentional killing of a man." Calhoun asserts that this statement shows that the circuit court considered an improper aggravating circumstance.
However, there is absolutely nothing in the record to support Calhoun's argument. *976 The circuit court found that the murder was committed during the course of a rape, robbery, and burglary and that the murder was committed by a defendant who had previously been convicted of three felonies involving the use of violence. See § 13A-5-49(1) and (2), Ala.Code 1975. The circuit court's jury instructions on the aggravating circumstances were correct and the circuit court's order reciting the aggravating circumstances as set out in § 13A-5-49, Ala.Code 1975, mirrored the statute. There is absolutely no indication that the circuit court considered and applied a nonstatutory aggravating circumstance.

C.
Third, Calhoun argues that the circuit court improperly considered the race of the defendant and the race of victim when assessing whether to impose the death sentence. Specifically, he states that the following remark in the circuit court's order shows that the sentence was imposed with consideration to the race of both the defendant and the victim, "The Court finds that the defendant is a black male and the victim, Tracy Phillips, was a white male."
Calhoun cites an isolated sentence; he fails to cite the context in which it was written. The circuit court's order states, in part:
"The Court finds that the sentence of death was not recommended by the jury under the influence of passion, prejudice, or any arbitrary factor.
"The Court finds that the defendant is a black male and the victim, Tracy Phillips, was a white male. The Court further taking judicial knowledge of the proceedings conducted before it, finds that the composition of the jury trying the defendant in this case was as follows: Seven (7) white males, one (1) black male, three (3) black females and one (1) white female. One (1) white female and one (1) black male were the alternate jurors. The Court further taking judicial knowledge finds that the foreperson both at the guilt stage and sentencing hearing was a black female."
(C.R. 143.) There is absolutely no support for Calhoun's argument in the record. Calhoun has distorted his argument by citing to an isolated comment made in the circuit court's sentencing order. There is no indication that the circuit court considered the race of the defendant when fixing his sentence at death.

D.
Fourth, Calhoun argues that the presentence report was based on inaccurate information; therefore, Calhoun argues, his death sentence must be set aside. Calhoun argues that the probation officer's account of the facts surrounding the offenses contained factual inaccuracies. He also cites the comments made by the probation officer in the presentence report, i.e., expressions of the horrific nature of the offenses and the victim-impact statements. Calhoun cites the case of Guthrie v. State, 689 So.2d 935 (Ala.Crim.App.1996), in which, he argues, we reversed a death sentence because the presentence report contained inaccurate information.
Calhoun did not object to the presentence report. At the sentencing hearing before the trial court the following occurred:
"The Court: I believe that I gave you a copy of the pre-sentence report. I forget when that was, probably a week ago?
"[Defense counsel]: Yes, sir.
"The Court: Have you had a chance to go over that with your client?

*977 "[Defense counsel]: We've gone over it. We had discussed a couple of issues.... In all fairness the issue that we would cover would not warrant a great deal of merit on the weighing of the case by the Court."
(R. 1683.) Because Calhoun did not object to the challenged portions, or indeed to any portion, of the presentence report, we review this issue for plain error. Rule 45A, Ala.R.App.P.
Section 13A-5-47, Ala.Code 1975, specifically states that before a circuit court may sentence a defendant convicted of a capital offense the circuit court must direct that a presentence report be prepared on the defendant. Rule 26.3(b), Ala.R.Crim.P., addresses the contents of the presentence report and states that the report may contain:
"(1) A statement of the offense and the circumstances surrounding it;
"(2) A statement of the defendant's prior criminal and juvenile record, if any;
"(3) A statement of the defendant's educational background;
"(4) A statement of the defendant's employment background, financial condition, and military record, if any;
"(5) A statement of the defendant's social history, including family relationships, marital status, interests, and activities, residence history, and religious affiliations;
"(6) A statement of the defendant's medical and psychological history, if available;
"(7) Victim Impact Statements; and
"(8) Any other information required by the court."
Here, the circuit court's sentencing order clearly states that each party was given a copy of the presentence report, yet Calhoun never challenged any inaccuracies in the report. Section 13A-5-47(d), Ala. Code 1975, specifically provides that the circuit court must make "written findings of facts summarizing the crime and the defendant's participation in it." The findings made by the circuit court were clearly based on the evidence presented during the trial, and they did not contain any of the inaccuracies that Calhoun challenges in the presentence report.
Moreover, Calhoun cites nothing in the circuit court's order that would indicate that the court relied on the now-challenged contents of the presentence report. As this Court stated in Kuenzel v. State, 577 So.2d 474, 528 (Ala.Crim.App.1990), aff'd 577 So.2d 531 (Ala.1991), quoting United States v. Giltner, 889 F.2d 1004, 1007 (11th Cir.1989):
"`When, as in this case, the defendant claims that his due process rights were violated by the sentencing court's reliance on materially false information, the defendant must establish not only that the disputed information is materially false or unreliable, but also that the sentencing judge relied on the information.'"
Also, it is clear that the circuit court did not consider the probation officer's comments concerning the horrific nature of the offense when sentencing Calhoun to death. The circuit court's order indicates that it did not consider any aggravating circumstances except those enumerated in § 13A-5-49, Ala.Code 1975. "Whatever the propriety of the comments in a presentence report, it would be a rare case indeed where a probation officer's rhetoric could overwhelm the independent judgment of a sentencing court." United States v. Espalin, 350 F.3d 488, 490 (6th Cir.2003) (Lawson, J., concurring).

XX.
Because the presentence report indicated that Calhoun had a low IQ we requested *978 that the parties brief the applicability of the United States Supreme Court's decision in Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), to Calhoun's sentence of death. The United States Supreme Court held in Atkins that it was a violation of the Eighth Amendment to execute a mentally retarded individual. The Supreme Court left it to the individual states to determine what constitutes mental retardation.
Although Alabama has yet to adopt legislation defining what constitutes mental retardation, the Alabama Supreme Court in Ex parte Perkins, 851 So.2d 453 (Ala.2002), upheld Perkins's death sentence under the most liberal definition of mental retardation adopted by these states that barred the execution of the mentally retarded. The Perkins court held that a three-pronged test is to be used when examining whether a defendant is mentally retarded for purposes of determining whether to impose the death penalty. We must examine whether the defendant (1) has a significantly subaverage intellectual functioning, i.e., an IQ of 70 or less; (2) has significant or substantial deficits in adaptive behavior; and (3) whether these deficits manifested themselves in the developmental period, i.e., before the age of 18.
Here, the record shows that when tested by Dr. Kathy A. Ronan, a psychologist at Taylor Hardin Secure Medical Facility, Calhoun had a full scale IQ of 66. It was Ronan's opinion that Calhoun was malingering and that his IQ was probably in the borderline range. Another expert, Dr. Alvin Sheeley, also examined Calhoun and performed an IQ test. Dr. Sheeley said that Calhoun's score on the IQ test was 58 but that it was his opinion that Calhoun was malingering and that he was much smarter than his IQ test indicated and that he was not mentally retarded.
Moreover, Calhoun had been married from 1988 until 1992, is the father of one son, and has maintained a relationship with the son since his divorce. The presentence report indicates that Calhoun had maintained jobs his entire adult life and that at the time of the murder he was working as a concrete finisher and making a wage of $17 per hour.
Calhoun does not fit even the most broad definition of mental retardation adopted by the Alabama Supreme Court in Perkins. See McWilliams v. State, 897 So.2d 437 (Ala.Crim.App.2004); Yeomans v. State, 898 So.2d 878 (Ala.Crim.App. 2004); Jenkins v. State, [Ms. CR-97-0864, February 27, 2004] ___ So.2d ___ (Ala. Crim.App.2004); Snyder v. State, 893 So.2d 488 (Ala.Crim.App.2001) (opinion on remand from the Supreme Court); Gavin v. State, 891 So.2d 907 (Ala.Crim.App. 2003); Peraita v. State, 897 So.2d 1161 (Ala.Crim.App.2003); Lewis v. State, 889 So.2d 623 (Ala.Crim.App.2003).
Neither does Calhoun's conviction violate the United States Supreme Court's decision in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). Calhoun was convicted of murdering Tracy Phillips during the course of a rape, a burglary, and a robbery. The felonies which elevated the murder to a crime punishable by death  rape, burglary, and robbery  were found to exist by the jury beyond a reasonable doubt in the guilt phase. There is no Ring violation here. Ex parte Waldrop, 859 So.2d 1181 (Ala. 2002).

XXI.
Last, as required by § 13A-5-53, Ala. Code 1975, this Court will consider the propriety of Calhoun's sentence of death. Calhoun was indicted and convicted for four counts of capital murder for murdering *979 Tracy Phillips during the course of committing a rape, a sodomy, a robbery, and a burglary.
The record shows that Calhoun's sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. Section 13A-5-53(b)(1).
The circuit court found as aggravating circumstances that the murder occurred during the course of a rape, a robbery, and a burglary, and that Calhoun had previously been convicted of three felonies involving the use or threat of violence to another person. See § 13A-5-49(4) and 13A-5-49(2), Ala.Code 1975. The circuit court considered the evidence presented for mitigating circumstances and found none to exist. We agree with the circuit court's findings.
However, as required by § 13A-5-53(b)(2), Ala.Code 1975, this Court must independently weigh the aggravating and the mitigating circumstances to determine the propriety of Calhoun's sentence to death. After an independent weighing, we are convinced, as was the circuit court, that Calhoun's death sentence is appropriate for Calhoun's actions.
Neither was Calhoun's sentence disproportionate or excessive to other sentences imposed in similar cases. Calhoun brutally murdered Tracy Phillips in front of his wife and child and then brutalized L.P. He then stole jewelry. Calhoun's sentence is neither disproportionate or excessive to sentences imposed in similar cases. See Neal v. State, 731 So.2d 609 (Ala.Crim.App.1997), aff'd, 731 So.2d 621 (Ala.), cert. denied, 527 U.S. 1027, 119 S.Ct. 2377, 144 L.Ed.2d 780 (1999); Snyder v. State, 893 So.2d 488 (Ala.Crim.App. 2001) (opinion on remand from the Supreme Court).
Last, we have searched the entire record for any error that may have adversely affected Calhoun's substantial rights and have found none. Rule 45A, Ala.R.App.P.
Calhoun's convictions and sentence of death are due to be, and are hereby, affirmed.
AFFIRMED.
COBB, BASCHAB, and WISE, JJ., concur; SHAW, J., concurs in part and concurs in the result, with opinion.
SHAW, Judge, concurring in part and concurring in the result.
I concur in the main opinion, with the exception of Part IV, as to which I concur only in the result.
NOTES
[1] To protect the anonymity of one of the victims in this case, we have used her initials. See Rule 52, Ala.R.App.P.
[2] Rule 9.3, Ala.R.Crim.P., often referred to as "the Rule" allows a circuit court to exclude certain witnesses from the courtroom during the trial.
[3] The Bethea Court specifically stated that because any error was harmless it would not reach the question whether the juror should have been removed for cause.
[4] "Counsel for [the defendant] stated there was `no objection' when the State offered the written report confirming [the defendant's] DNA matched the DNA sampled from the rape kit to a certainty of 1/125,000,000. Thus, [the defendant] waived his right to complain about the admissibility of the DNA evidence."

Welch v. State, 993 S.W.2d 690, 694 (Tex.Ct. App.1999).
[5] Calhoun also goes by the name of Cody.
[6] We note that Parsons was released many years before Alabama adopted the Alabama Rules of Evidence. Writings used to refresh a witness's memory are now addressed in Rule 612, Ala.R.Evid.
[7] Calhoun argues that these comments were made in the prosecutor's closing argument but the record clearly shows that this comment was made in counsel's opening statement in the guilt phase.
[8] L.P. testified that Calhoun let her keep her wedding band.
[9] Here, the circuit court issued four separate orders. The orders were entitled, "Findings of Fact by the Court from the Evidence," "Findings of Fact in Regard to Punishment Phase of the Trial," "Consideration, Findings and Determination of Sentence as Required by Section 13A-5-47(b)," and "Sentence."